Queen Insurance Company et al. v. The State of Texas.

No. 49.

### 1. Trusts—Illegal Combinations—Act of March 21, 1887.

Chapter 117, Acts of Twenty-first Legislature, page 141, entitled "An act to define trusts, and to provide for penalties and punishment of corporations, persons, firms, and associations of persons connected with them, and to promote free competition in the State of Texas," did not apply to a combination to fix rates of insurance, or the commissions of the agents of insurance companies. These combinations are not embraced within the provisions of the act.................... 261

### 2. Combination to Fix Rates by Insurance Companies.

A combination between two or more insurance companies to increase their rates, or to diminish the rates to be paid to their agents, is in a general sense a combination in restraint of trade. But we think that the words "restrictions in trade" were not intended to receive that construction in the statute. But if so intended, the words do not sufficiently designate an offense, so as to make it punishable. The clause is, "a combination of capital, * * * first, to create or carry out restrictions in trade." The acts charged do not subject defendants to the penalties therein provided *as restrictions in trade* ................ 261

### 3. Combinations in Restraint of Trade.

Contracts in restraint of trade, to be unlawful, must be unreasonable. The statute, however, makes no distinction between such restraints of trade as are reasonable and such as are unreasonable. It can not be held that the legislative intent was to make both alike felonies. It is held, that the word *trade* in the statute is used as synonymous with *traffic*. In this sense, it embraces the buying and selling of any article of commerce. * * * But it does not embrace the business of insurance, which is trade only in the sense that it is an occupation or employment .................................................. .......... 264

### 4. Insurance not a Commodity.

Insurance can not be classed as a *commodity*, as that word is used in said statute. Insurance is not commerce, but an aid to commerce ........ 265

### 5. Trusts.

In the statute the word *trust* is not used in a technical sense. The act seems to have been directed against combinations of corporations and of capitalists to increase the price of articles of prime necessity, or the charges of transportation. In this view the first section of article 1 of the act may be taken as indicating the general purpose and the remaining part of article 1 as definitions or explanatory .................... 266

### 6. Construction of the Trust Act.

This act, chapter 117, Acts of Twenty-first Legislature, defines trusts, and while not expressly denouncing penalties against the violation of the provisions of the act, yet it is plainly imported from the language that acts forbidden should be subject to the punishment affixed to the acts. 268

### 7. Contracts Illegal at Common Law— Combinations—Prime Necessity.

At common law, all combinations among dealers in provisions or other articles of prime necessity are deemed contrary to public policy, and contracts to effect or carry out such combinations are held void...... 269

**8. Insurance not of Prime Necessity.**

Insurance is a mere contract of indemnity against a contingent loss.
Though it is an important aid to commerce, it is not a business of
commerce, or one in which the public have any direct right. Labor is
more necessary to commerce, yet combinations among laborers to se-
cure satisfactory wages are lawful. The alleged combinations are not
unlawful at common law............................................ 270

**9. Quære.**

Whether at common law courts would enjoin the fulfillment of an ille-
gal contract. The general rule is to leave the parties as they are, assist-
ing neither party................................................... 274

**10. Combinations Hurtful to Trade.**

The subject is a political one over which the Legislature has full power
to enact such laws as may be needed from public policy.............. 275

ERROR to Court of Civil Appeals for Third District, in an appeal from
Travis County.

Associate Justice KEY did not sit in the case in the Court of Civil Ap-
peals. The opinion was delivered by Associate Justice COLLARD.

This suit was filed in the District Court of Travis County, June 13,
1891, in the name of the State of Texas, upon the relation of the Attor-
ney-General, against the Queen Insurance Company and fifty-four other
fire insurance companies doing business in the State of Texas, and the
Texas Insurance Club. It was alleged that the defendants had combined
together to fix the rates of local insurance agents at a commission not ex-
ceeding 15 per cent upon premiums received. This action was instituted
under the provisions of "An act to define trusts, and to provide for pun-
ishments and penalties of corporations, persons, firms, and associations of
persons connected with them, and to promote free competition in the State
of Texas," approved March 30, 1889, generally known as the Trust Law.

The prayer was for an injunction against carrying out the agreement
with respect to agents' commissions, and also for forfeiture of the right
of the several defendants to do business in Texas, on account of the vio-
lation of the Trust Act aforesaid. A demurrer was sustained to the orig-
inal petition. The State then amended her petition, alleging, in addition
to allegations of the original, that the defendants had combined together
to employ a common agent to fix and establish uniform rates of insurance
throughout the State of Texas, which they had proceeded to enforce, to
the detriment of the public, and an injunction was prayed for against
carrying out said agreement, as well as the agreement to fix local agents'
commissions, on the ground that the State, through its Attorney-General,
had the right to apply for an injunction to restrain any person or corpo-
ration from any act prejudicial to the interests of the public, even should
the Trust Act aforesaid be held to be invalid.

At a subsequent term, on the —— day of March, 1892, the court sus-
tained the demurrer of the defendants to the amended petition, in so far

as it is based upon the statute, holding, first, that the act does not apply to the business of fire insurance; and second, that the act itself is unconstitutional on account of the exemption of certain classes in the thirteenth section thereof. The demurrer to the petition, on the ground that the State of Texas has no right to maintain the action without statutory authority, was overruled.

The court then proceeded to try the cause without a jury, and rendered judgment enjoining the defendants from combining to fix the commissions of their local agents, and to establish or maintain uniform agreed rates of insurance throughout the State. Both parties appealed. The judgment of the District Court was affirmed by the Court of Civil Appeals.

The defendants, in petition for writ of error, complained that the Court of Civil Appeals erred—

1. In deciding that the Attorney-General had authority to institute or prosecute the suit.

2. In holding that a cause of action existed against plaintiffs in error under the common law.

3. In not deciding that the Act of the Legislature of State of the Texas of March 30, 1889, known as the Trust Law, does not apply to the business of fire insurance.

4. In not deciding that said law was unconstitutional and void, by reason of the exceptions contained in the thirteenth section thereof.

The State, by the Attorney-General, also in application for writ of error, urged the following as errors in the decision:

1. The Court of Civil Appeals erred in holding that the Act of March 30, 1889, " does not constitute a law; it commands nothing and prohibits nothing." Said court erred, because said act is a valid law, and it prohibits trusts, combinations, and conspiracies against trade of every nature, and it provides a penalty for a violation of its provisions.

2. It erred in its conclusions of law to the effect that the said Act of March 30, 1889, is not a law, and that no suit or prosecution can be maintained under it; because said act is a valid and subsisting law, and it commands the Attorney-General, as an executive officer of the State, to institute proceedings under it, and to see that its provisions are properly enforced.

3. In refusing to consider the said act in the disposition made of this case by said court, and in refusing to render judgment for the State, cancelling permits of the defendants and perpetually enjoining them from doing business as fire insurance companies within the limits of the State.

4. In refusing to consider the terms and provisions of said act, and in refusing to determine whether or not its provisions were applicable to the trust, combination, and conspiracy against trade alleged against defendants, and in holding that said law was inoperative, because, etc.

5. In refusing to pass upon the constitutionality of said act. The validity of said act was fairly and properly presented to said court by the exceptions of the State to the judgment of the lower court, and ought to have been considered and passed upon by the Court of Civil Appeals; and said court erred in not rendering judgment holding said law in all things to be constitutional and valid.

6. The question of whether the business of fire insurance, as transacted by the defendants in this State, is embraced within the terms of the said act was properly and fairly presented to the court by the State's bill of exceptions.   *   *   *

*Leake, Shepard & Miller,* for plaintiffs in error.—1. The court erred in the judgment, in this: After sustaining defendant's demurrer to plaintiff's petition, on the ground that the statute upon which the same was based did not embrace the business of defendants within its terms, and that said statute was also unconstitutional, in then holding that the said petition set out a good cause of action at common law, and that the State, by its Attorney-General, had the right to prosecute the same. The State v. Loan and Trust Co., 81 Texas, 530; United States v. Tin Co., 125 U. S., 273; Attorney-General v. Ice Co., 104 Mass., 244; City of Georgetown v. Alexandria, 12 Pet., 91; Attorney-General v. Salem, 103 Mass., 138, 140; The State v. Schweickhardt, 19 S. W. Rep., 47; Attorney-General v. Ins. Co., 2 Johns. Ch., 371; The People v. Railway, 57 N. Y., 161.

2. The court erred in rendering judgment against the said defendants, enjoining them from carrying out their agreement not to pay the local agents more than 15 per cent commissions, and not to place their business in the hands of any agent who should demand and receive more than said amount of commission from any other company, because said agreement is not against the public interest, but, on the contrary, is in accord therewith, as its tendency would necessarily be towards the reduction of rates of insurance charged the public, through the lessening of the expenses of the business. Delz v. Winfree, 80 Texas, 400; Ladd v. Manfg. Co., 53 Texas, 172; Tied. on Lim. of Police Pow., 226; Cool. on Torts, 278; Greenh. on Pub. Pol., 648; Koehler v. Feuerbacher, 2 Mo. App., 11; Steamship Co. v. McGregor, L. R. 1892, App. Cases, 25; 34 Cent. Law J., 169.

3. The court did not err in sustaining the defendants' exceptions to so much of the petition as charged a violation of the trust act:

(1) The act neither applies to nor embraces within its terms or intendment the business of defendants, which is neither an article of trade or commerce, nor a commodity. nor the subject of barter and sale, as alleged by plaintiff, but is the indemnity of property owners by contract against loss by fire under certain circumstances and conditions stipulated for therein. Paul v. Virginia, 8 Wall., 168; The State v. Henkel, 19 Mo.,

225; Barnett v. Powell, Litt. Select Cases, 409; Fleckner v. Bank, 8 Wheat., 338; Engelking v. Von Wamel, 26 Texas, 469.

(2) The clause of said act prohibiting combinations "to create and carry out restrictions in trade" is inoperative and of no force and effect, because there is no provision of the said statute which defines the offense of restrictions in trade, and there is no such offense anywhere created by or defined in any other provision of the Penal Code of the State of Texas. Penal Code, arts. 1, 3, 9; Wolfe v. The State, 6 Texas Cr. App., 195; Johnson v. The State, 4 Texas Cr. App., 63; Rodgers v. The State, 8 Texas Cr. App., 400; Alexander v. The State, 29 Texas, 495; Willson's Crim. Forms, 226, 227.

(3) The combination charged against defendants, and the acts alleged to have been committed in pursuance thereof, namely, the attempt to fix a uniform rate of commission to be paid to soliciting agents, do not create, or tend to create, or carry out restrictions in trade; because, instead of working a public injury, as all contracts respecting trade must do in order to be an illegal restriction thereof, the necessary tendency and result of this reduction of expenses with respect to agents must be to promote the public interest by cheapening the cost of indemnity against loss by fire to the great body of the people of the State. Ladd v. Manf. Co., 53 Texas, 172; Delz v. Winfree, 80 Texas, 400; Tied. on Lim. of Police Pow., 226; Greenw. on Pub. Pol., 648; Koehler v. Fuerbacker, 2 Mo. App., 11; Navigation Co. v. Windsor, 20 Wall., 68; Bish. on Con., secs. 514, 516, 518, 523; Cool. on Torts, p. 278; Croft v. McConoughy, 79 Ill., 346; Alger v. Thatcher, 19 Pick., 51; Pike v. Thomas, 4 Bibb, 486.

(4) The act is invalid, because in conflict with the provision of the Constitution of the State of Texas which prohibits the Legislature from passing any "local or special law regulating labor, trade," etc.; because said act, though pretending on its face to include all classes and conditions of men who might have it within their power to increase the cost of articles of consumption and support of life, in the thirteenth section thereof, expressly exempts all raisers and producers of agricultural products and livestock, who constitute the great mass of the people, and by so doing seeks to evade the effect of the said provision of the Constitution. Const., art. 3, sec. 56; Ex Parte Westerfield, 55 Cal., 550.

(5) The said act is void, because in conflict with the Constitution of the State of Texas and the Bill of Rights therein, which declares that "all men shall have equal rights, and that no man or set of men is entitled to exclusive public emoluments or privileges but in consideration of public services, and that no citizen shall be deprived of life, liberty, property, privileges, or immunities, or in any manner disfranchised, except by the due course of the law of the land;" and with the Constitution of the United States, which declares that "no State shall deprive any person of life, liberty, or property without due process of law, nor deny

to any person within its jurisdiction the equal protection of the law;" because, while pretending to embrace within its purview all classes and conditions of men, in order to prevent combinations by which the cost of the necessaries and comforts of life to the people might be increased, it is, by the express exemption of producers and raisers of agricultural products and livestock contained in the thirteenth section, limited in its application to a comparatively small portion of the people, who are thereby subjected to pains and penalties not inflicted upon the great majority of the people under similar circumstances and conditions. Texas Bill of Rights; Const. U. S., 14th Amendment; Dillingham v. Putnam, 14 S. W. Rep., 303; Janes v. Reynolds, 2 Texas, 251; Hewitt v. The State, 25 Texas, 722; Bank v. Cooper, 2 Yerg., 599; Walley's Heirs v. Kennedy, 2 Yerg., 554; Loan Association v. Topeka, 20 Wall., 655; Holden v. James, 11 Mass., 396; Lewis v. Webb, 3 Me., 320; Simons v. Simons, 103 Mass., 572; Millett v. The People, 117 Ill., 294; Baggs' Appeal, 43 Pa. St., 512; Durkee v. City of Janesville, 28 Wis., 464; The People v. Hurlburt, 24 Mich., 44; The State v. Goodwell, 10 S. E. Rep., 285; The State v. Coal and Coke Co., 10 S. E. Rep., 288; Goodcharles v. Wiggeman, 113 Pa. St., 354; Wilder v. Railway, 38 N. E. Rep., 289; The People v. Common Council, 38 N. W. Rep., 470; Chair Co. v. Runnells, 43 N. W. Rep., 1006; City of Janesville v. Carpenter, 77 Wis.; Gordon v. Building Assn., 12 Bush, 110; Ragio v. The State, 6 S. W. Rep., 401; City of Shreveport v. Levy, 26 La. Ann., 671; Ex Parte Westerfield, 55 Cal., 550; Clark v. Free Press, 72 Mich, 560; Pierce v. City of Portland, 69 Me., 278; Railway v. Morriss, 65 Ala., 193; Railway v. Morse, 60 Miss., 641.

As to the effect of the Fourteenth Amendment to the United States Constitution: Barbier v. Connolly, 113 U. S., 27; Yick Wo v. Hopkins, 118 U. S., 356; Dent v. West Virginia, 129 U. S., 114; Virginia v. Rives, 100 U. S., 313; Ex Parte Virginia, 100 U. S., 339; Strauder v. West Virginia, 100 U. S., 303.

*Leake, Henry, Miller & Reeves*, filed an elaborate argument supporting the propositions made in brief.

*C. A. Culberson*, Attorney-General, and *Frank Andrews*, Assistant, for the State.—1. The petition set forth a good cause of action against the defendants, and the Attorney-General had the authority, and it was his duty under the Constitution and laws of this State, to institute and maintain the action in behalf of the State, and the court did not err in so holding. Const., art. 4, sec. 22; Rev. Stats., art. 2806; The State v. Trust Co., 81 Texas, 530; Traffic Assn. Case, 72 Texas, 404; United States v. Tin Co., 125 U. S., 273; United States v. Railway, 98 U. S., 569; United States v. Throckmorton, 98 U. S., 71; 77 Ill., 426; 77 Cal., 360; People v. Minor, 2 Lans., 398, sec. 5; Attorney-General v. Railway, 35 Wis.,

425; Attorney-General v. Ice Co., 104 Mass., 237; Attorney-General v. Ins. Co., 2 Johns. Ch., 371; The People v. Ins. Co., 15 Johns., 358; Cook on Stockh., sec. 37; Green's Brice's Ultra Vires, 3 ed., 708, 709.

2. The court did not err in rendering judgment against defendants, enjoining them from carrying out their agreement to fix, regulate, and control the rates of commission to be paid to fire insurance agents for their labor in this State, and the evidence conclusively sustains the findings of the court that such combinations existed, and that the same created a monopoly and prevented free and unrestricted competition in the labor, occupation, and profession of fire insurance agents in the insurance business in the State of Texas. Const., art. 1, secs. 3, 17, 26; Moore v. Bennett, 29 N. E. Rep., 888; The People v. Fisher, 14 Wend., 9; Rex v. Mawbey, 6 T. R., 619, 636; Hilton v. Eckersly, 6 El. & Bl., 47.

3. The court did not err in rendering judgment against appellants enjoining and restraining them from carrying out their combination, conspiracy, trust, and agreement to fix, regulate, and control, and to keep at a common fixed and graduated figure, the rates of fire insurance in this State. The evidence conclusively sustains the finding of the court, that such combination on the part of appellants existed, and that the same was a monopoly, and prevented and destroyed free and unrestricted competition in the fire insurance business of this State.

4. Private corporations created by the Legislature or under its authority may lose their franchises by misuser or nonuser of them, and the same may be resumed by the government under a judicial judgment upon a quo warranto to ascertain and enforce a forfeiture. This is the common law of the land, and is a tacit condition annexed to the creation of every such corporation; and the combination and monopoly alleged and proved in this case is such a misuser as would warrant the State in restraining the combination and resuming the franchises, such combination and monopoly being against the public policy of this State. Const., art. 1, secs. 26, 17, 3; Act of March 30, 1889; Traffic Association Case, 72 Texas, 404; Oil Co. v. Adoue, 83 Texas, 650; City of Brenham v. Water Works Co., 67 Texas, 542; 1 Black. Com., 153; 122 Pa. St., 154; The People v. Bristol, 23 Wend., 236; Slee v. Bloom, 5 Johns. Ch., 366; Ward v. Farwell, 97 Ill., 433; The People v. Dispensary, 7 Lans., 306; May v. Railway, 113 N. Y., 319; Terrell v. Taylor, 9 Cranch, 52; 2 Kent's Com., 312; Ins. Co. v. Needles, 113 U. S., 574; Commonwealth v. Bank, 21 Pick., 542; Ang. & Ames on Corp., sec. 774; Water. on Corp., secs. 427, 1024; Tayl. on Corp., secs. 287, 457, 459; Railway v. Keokuk, 113 U. S., 384; The State v. Railway, 45 Wis., 590; 4 Gill & Johns., 121; Fertilizing Co. v. Hyde Park, 97 U. S., 666; Rector, etc., v. Philadelphia Co., 24 How., 301; Tucker v. Ferguson, 22 Wall., 527; Railway v. Supervisors, 93 U. S., 595; Bank v. Whitney, 103 U. S., 102; The People v. Palmer, 109 N. Y., 110; Richardson v. Buhl, 77 Mich., 632; Butchers' Un. Co.

v. Crescent City Co., 111 U. S., 761; Alger v. Thatcher, 31 Am. Dec., 121; Anderson v. Jett, 31 Alb. Law Jour., 134; State v. Goodall, 45 Alb. Law Jour., 53; River Bridge v. Warren Bridge, 11 Pet., 507; Morris v. Coal Co., 68 Pa. St., 173; Stewart v. Transportation Co., 17 Minn., 395; Bagging Assn. v. Kock, 14 La., 168; Colles v. Trow City Co., 11 Hun, 397; Messenger v. Railway, 8 Vroom, 535; Railway v. Collins, 40 Ga., 582, 627; Croft v. McConoughy, 79 Ill., 346; Salt Co. v. Guthrie, 35 Ohio, 672; 4 Denio, 532; 5 Denio, 434; 44 N. Y., 87; The People v. Refining Co., opinion Judge Barrett, Combinations and Trusts, p. 288; King v. Journeymen Tailors of Cambridge, 8 Mod., 11.

5. The Act of March 30, 1889, to define trusts, and provide for punishments and penalties of corporations, persons, firms, and associations of persons connected with them, and to promote free competition in the State of Texas, includes within its terms and intendment every trust, combination, and illegal conspiracy or other agreement in restraint of trade, and was intended to apply and does apply to every nature of trust, in whatsoever business, occupation, or profession the same may be formed. Act of March 30, 1889, Gen. Laws 21st Leg., p. 141; Const., art. 1, sec. 26; Suth. on Stat. Const., secs. 234, 240, et seq.; 1 Kent, 461; "Commerce," And. Law Dic.; Welton v. Missouri, 91 U. S., 280; Webber v. Virginia, 103 U. S., 350; Walling v. Michigan, 116 U. S., 454; Robinson v. Tax District, 120 U. S., 497; "Commodity," And. Law Dic.; Webster's International Dic., 1890 ed.; Commonwealth v. Bank, 123 Mass., 495; Ins. Co. v. Commonwealth, 123 Mass., 163; Gleason v. McKay, 124 Mass., 424; Bank v. Apthorp, 12 Mass., 232; Provident Institution v. Massachusetts, 6 Wall., 624; Tel. Co. v. Alabama, 132 U. S., 473; "Trade," And. Law Dic.; Schooner Nymph, 1 Sumn., 516; Paul v. Virginia, 8 Wall.; 183.

6. The Act of March 30, 1889, defining and prohibiting trusts, is not rendered unconstitutional because of the exception in the thirteenth section thereof, because the said act applies equally to all persons and classes of persons in the same conditions and circumstances; and the court should never declare unconstitutional and void any statute which has received sanction of the co-ordinate legislative and executive departments of the government, unless there is an irreconcilable conflict between such statute and the organic law of the State. Const. 1876, art. 8, sec. 1, art. 7, sec. 7; Const. 1845, art. 8, sec. 27; Const. 1869, art. 12, sec. 19; Gen. Laws 1887, p. 132; Gen. Laws 1881, p. 113; Penal Code, arts. 186, 318, 319; Bell v. The State, 28 Texas Cr. App., 96; Ex Parte Bell, 24 Texas Cr. App., 428; Goldsticker v. Ford, 62 Texas, 385; Ex Parte Sundstrum, 25 Texas Cr. App., 133, and cases cited; Dillingham v. Putnam, 14 S. W. Rep., 304; Railway v. Ellis, opinion by Hobby, P. J.; Express Co. v. Seibert, 142 U. S., 339; Railway v. Gibbes, 142 U. S., 386; Wheeler v.

Philadelphia, 77 Pa. St., 338; Thomason v. Ashworth, 73 Cal., 786; Knickerbocker v. The People, 102 Ill., 218; Kilgore v. Magee, 85 Pa. St., 401; Railway v. Iowa, 94 U. S., 155; McAninch v. Railway, 20 Iowa, 343; Smith v. Judge, 17 Cal., 548; Roberts v. City of Boston, 5 Cush., 198; Ward v. Flood, 8 Cal., 36; Granger Cases, 94 U. S., 113; Phillips v. Railway, 86 Mo., 540; Humes v. Railway, 82 Mo., 221; Railway v. Humes, 115 U. S., 512; Railway v. Terry, 115 U. S., 523; Barbier v. Connolly, 113 U. S., 27; Soon Hing v. Crowley, 113 U. S., 703; Davidson v. New Orleans, 96 U. S., 97; Suth. on Stat. Const., sec. 120, et seq., 127; Droesch v. The State, 42 Ind., 547; Heanly v. The State, 74 Ind., 79; Elder v. The State, 74 Ind., 162; Perry v. King, 56 N. H., 530; Davis v. The State, 3 Lea, 376; License Tax Cases, 5 Wal., 569; The People v. Railway, 34 Barb., 138; Cool. on Const. Lim., 6 ed., 192, 193, 197, 201, 210, 211, and cases cited; Fletcher v. Peck, 6 Cranch, 330; Railway v. Commonwealth, 18 S. W. Rep., 368; Van Riper v. Parsons, 40 N. J. Law, 123.

Counsel also filed an exhaustive argument upon the points made in brief.

GAINES, Associate Justice. — This action was brought in the name of the State of Texas by its Attorney-General against the " Texas Insurance Club," an association of insurance agents, and against fifty-seven foreign insurance corporations, doing business in this State under permits granted in pursuance of the statutes of the State. It is alleged in the petition, that the Texas Insurance Club was created with the consent and by the procurement of the other defendants, with the object of organizing a combination for the purpose of fixing a uniform rate of insurance throughout the State upon a graduated scale, and of thereby preventing competition among each other, and at the same time of establishing a fixed rate of commission to be paid to the agents of such companies. It is claimed in the petition, that the acts charged against the defendants show an illegal combination, as defined and denounced in the Act of March 21, 1889, entitled "An act to define trusts, and to provide for penalties and punishment of corporations, persons, firms, and associations of persons connected with them, and to promote free competition in the State of Texas." Laws 1889, p. 141. It is also claimed in the petition, that the combination, purposes, and acts of the defendants are in restraint of trade, and contrary to public policy, and therefore illegal at common law. The prayer was, that the Texas Insurance Club be dissolved, and that the permits of the other defendants be cancelled, or that the defendants be enjoined from carrying out the objects of the combination as alleged in the petition.

The trial court held, that the Act of March 21, 1889, did not apply to a combination to fix rates of insurance or the commissions of the agents

of insurance companies, and also that the act was unconstitutional and void by reason of the thirteenth section, which excepted from its operation " agricultural products and livestock while in the hands of the producer or raiser;" and sustained a demurrer to so much of the petition as charged a violation of that statute. However, the demurrer to that part of the petition which charged a combination alleged to be illegal at common law was sustained; and after hearing the evidence the court held that the effective allegations of the bill were sustained by the proof, and entered a decree enjoining the defendants from making or carrying out any agreements between them establishing fixed rates of insurance or fixing the percentage of commissions to be paid to their agents.

The defendants appealed, and the Attorney-General filed cross-assignments of error. The Court of Civil Appeals affirmed the judgment of the District Court in every particular, but held that the statute of March 21, 1889, was invalid, because it nowhere in terms declared that " trusts " such as are defined in the first section are illegal.

Assuming that the whole case is before us upon the pleadings and facts as determined by the Court of Civil Appeals, we will proceed to dispose of the questions involved in it, so far as may be necessary for its disposition.

The Act of March 21, 1889, reads as follows:

"An act to define trusts, and to provide for punishments and penalties of corporations, persons, firms, and associations of persons connected with them, and to promote free competition in the State of Texas.

" Section 1. Be it enacted by the Legislature of the State of Texas: That a trust is a combination of capital, skill, or acts by two or more persons, firms, corporations, or associations of persons, or of either two or more of them, for either, any, or all of the following purposes: First. To create or carry out restrictions in trade. Second. To limit or reduce the production, or increase or reduce the price of merchandise or commodities. Third. To prevent competition in manufacture, making, transportation, sale, or purchase of merchandise, produce, or commodities. Fourth. To fix at any standard or figure, whereby its price to the public shall be in any manner controlled or established, any article or commodity of merchandise, produce, or commerce intended for sale, use, or consumption in this State. Fifth. To make or enter into or execute or carry out any contract, obligation, or agreement of any kind or description by which they shall bind or have bound themselves not to sell, dispose of, or transport any article or commodity, or article of trade, use, merchandise, commerce, or consumption below a common standard figure, or by which they shall agree in any manner to keep the price of such articles, commodity, or transportation at a fixed or graduated figure, or by which they shall in any manner establish or settle the price of any article or commodity or transportation between them or themselves and others,

to preclude a free and unrestricted competition among themselves or others in the sale or transportation of any such article or commodity, or by which they shall agree to pool, combine, or unite any interest they may have in connection with the sale or transportation of any such article or commodity, that its price might in any manner be affected.

\*     \*     \*     \*     \*     \*     \*     \*     \*

" Section 4. Every foreign corporation violating any of the provisions of this act is hereby denied the right and prohibited from doing any business within this State; and it shall be the duty of the Attorney-General to enforce this provision by injunction or other proceedings in the District Court of Travis County, in the name of the State of Texas. .

\*     \*     \*     \*     \*     \*     \*     \*     \*

" Section 6. Any violation of either or all the provisions of this act shall be and is hereby declared a conspiracy against trade; and any person who may be and may become engaged in any such conspiracy or take part therein, or aid or advise in its commission, or who shall as principal, manager, director, agent, servant, or employe, or in any other capacity, knowingly carry out any of the stipulations, purposes, prices, rates, or orders thereunder or in pursuance thereof, shall be punished by fine not less than $50 nor more than $5000, and by imprisonment in the penitentiary not less than one nor more than ten years, or by either such fine or imprisonment.    Every day during a violation of this provision shall constitute a separate offense.

" Section 7. In any indictment for an offense named in this act, it is sufficient to state the purposes or effects of the trust or combination, and that the accused was a member of, acted with or in pursuance of it, without giving the name or description, or how, when, or where it was created.

.    " Section 8. In prosecutions under this act it shall be sufficient to prove that a trust or combination as defined herein exists, and that the defendant belonged to it or acted for or in connection with it, without proving all belonging to it, or proving or producing any article of agreement or written instrument on which it may have been based, or that it was evidenced by any written instrument at all.    The character of the trust alleged may be proved by its general reputation.

\*     \*     \*     \*     \*     \*     \*     \*     \*

" Section 10. Each and every person, firm, corporation, or association of persons who shall in any manner violate any of the provisions of this act, shall for each and every day that such violation shall be committed or continued, forfeit and pay the sum of $50, which may be recovered in the name of the State of Texas, in any county where the offense is committed, or where either of the offenders reside, or in Travis County; and it shall be the duty of the Attorney-General or the district or county attorney to prosecute for and receive the same.

" Section 11. That any contract or agreement in violation of the pro-

visions of this act shall be absolutely void, and not enforceable either in law or equity.

"Section 12. That the provisions hereof shall be held cumulative of each other and of all other laws in any way affecting those now in force in this State.

"Section 13. The provisions of this act shall not apply to agricultural products or livestock while in the hands of the producer or raiser."

The omitted sections throw no light upon the questions under consideration.

Admitting for the present, that the language of the statute sufficiently manifests the intention of the Legislature to make such combinations as are defined therein unlawful, and to make punishable acts committed in violation of its provisions, and that it is not in conflict with the Constitution by reason of the fact that it exempts "agricultural products and livestock while in the hands of the producer and raiser" from its operation, we still have the question, whether the combination charged in the petition is embraced within the provisions of the law. We are of opinion that that question must be answered in the negative. To determine that it is so embraced, we must hold either that it is a restriction on trade within the meaning of the first subdivision of section 1, and that those words sufficiently define an offense so as to make it punishable under our laws, or that the contract of insurance is a commodity such as is named in the other subdivisions.

A combination between two or more insurance companies to increase their rates or to diminish the rates to be paid to their agents, is in a general sense a combination in restraint of trade. But we think that the words "restrictions in trade" were not intended to receive that construction in the statute under consideration. If so intended, it may be gravely doubted whether under our laws they sufficiently designate an offense so as to make it punishable. Our Penal Code contains the following general provisions.

"Article 3. In order that the system of penal law in force in this State may be complete within itself, and that no system of foreign laws, written or unwritten, may be appealed to, it is declared that no person shall be punished for any act or omission unless the same is made a penal offense and a penalty is affixed thereto by the written law of this State."

"Article 6. Whenever it appears that a provision of the penal law is so indefinitely framed, or of such doubtful construction, that it can not be understood, either from the language in which it is expressed or from some other written law of the State, such penal law shall be regarded as wholly inoperative."

"Article 9. This code, and every other law upon the subject of crime which may be enacted, shall be construed according to the plain import of the language in which it is written, without regard to the distinction

usually made between the construction of penal laws and laws upon other subjects; and no person shall be punished for an offense not made penal by the plain import of the words of the law.''

It must be conceded, that except as to laws which result in a contract or which create a vested right, it is not in the power of one Legislature to control the action of another. Any statute laying down a canon of construction may, as a general rule, be repealed, either expressly or impliedly, by a subsequent statute; and where, under a rule of construction declared in a former law, a statute can not take effect which would be operative but for the former act, the argument is certainly cogent, that it was the intention of the Legislature in the last enactment to repeal the rule of construction laid down in the former. But it may be argued with equal force that a provision of the Penal Code affixing a punishment to an act named or otherwise designated, but not accurately and expressly defined, should be enforced, notwithstanding the rules of construction laid down in its general provisions.

It may be plausibly maintained, that the intention was that all the provisions should stand together, and that the special provision should be deemed an exception, and that the general rule should yield to it. Yet under section 3 of the Penal Code, as it existed before the Revised Statutes took effect, which '' declared that no person should be punished for any act or omission as a penal offense unless the same is expressly defined,'' it was held that a special provision of that code which sought to make punishable an act without defining it, was inoperative. Johnson v. The State, 4 Texas Cr. App., 63; Wolff v. The State, 6 Texas Cr. App., 195; Rogers v. The State, 8 Texas Cr. App., 401; see also, The State v. Foster. That provision was repealed by the Revised Statutes, which adopted in its stead the amended section 3 herein before quoted. But in French v. The State, 14 Texas Criminal Appeals, 76, article 398, as amended by the Act of March 27, 1879 (Laws 1879, p. 67), was held inoperative by reason of the rule of construction laid down in article 6, supra.

In like manner in Ex Parte Gregory, 20 Texas Criminal Appeals, 210, the rule of construction announced in article 9 was recognized as applicable to a municipal ordinance.

That article was primarily intended to abrogate the rule of the common law, that penal statutes should be construed strictly; but it expressly declares another rule, which is in accord with the common law, and which is founded upon the soundest reason.

There is a maxim, that ignorance of the law excuses no one; which is not true as applied to every case. For a man is not guilty of theft who honestly takes property under an honest claim of right, though he may be mistaken as to the law. But it is true in the sense that no one can allege his ignorance of the law which makes a certain act penal, in justi-

fication of his commission of that act. If he be held bound to know the law, he should have the means of knowing it, and hence he should not be punished for the infringement of a statute unless it designate with a fair degree of clearness and precision the act or omission which is forbidden by it. The offense need not be defined in the logical or legal sense of that word; for general terms may be used which in themselves require to be defined; but the terms employed should be sufficiently definite in their meaning as plainly to designate the very act which is sought to be made punishable by law.

Applying these rules of construction, we are of opinion that the acts charged against the defendants do not subject them to the forfeitures and penalties therein provided for, under that part of the statute which seeks to make unlawful combinations " to create or carry out restrictions in trade." These words are very comprehensive in any aspect; and if their meaning be limited, it becomes difficult to define the sense in which they were employed by the Legislature. In ordinary language, the word " trade " is employed in three different senses; first, in that of the business of buying and selling; second, in that of an occupation generally; and third, in that of a mechanical employment, in contradistinction to agriculture and the liberal arts. Ordinarily, when we speak of " trade," we mean commerce or something of that nature; when we speak of " a trade," we mean an occupation in the more general or the limited sense.

In law, the words restraint of trade are fairly well defined; and the question presents itself, whether in the use of the words " restrictions in trade " the Legislature meant to use the word " trade " in the last sense or as the mere equivalent of commerce or traffic.

Some contracts in restraint of trade are held to be contrary to public policy, and unlawful in the sense that they will not be enforced by the courts. Others are lawful and enforceable. To be unlawful, they must be unreasonable. As to restraints which are reasonable, the authorities are not in accord; though the evident tendency of modern decision is to uphold such contracts in doubtful cases. The rule as to contracts in unreasonable restraint of trade has been applied without question to very varied employments; to professional men, such as attorneys at law and physicians, as well as to merchants, shopkeepers, carriers, and those engaged in mechanical pursuits of every character. The rule is founded both upon the ground that the public has an interest in the employment, and upon the further ground that it is contrary to public policy that any person should wholly deprive himself of his right to pursue an occupation in which he is presumably skilled. See Mitchell v. Reynolds, 1 Smith's Lead. Cases, 8 Am. ed., 417, and Eng. and Am. notes.

But while a party may bind himself for an adequate consideration not to pursue his avocation within the limits of a prescribed locality, provided

the limits be reasonable, he can not bind himself not to follow his trade in any place whatever.

Now an agreement between two or more persons, by which one of them undertakes to bind himself not to follow his trade or to practice a profession in a territory of prescribed limits, is "a combination" within the meaning of the statute under consideration. A contract between two or more to do a thing is a "combination of  *  *  *  acts" of such persons to bring about the performance of the contract. It is upon this theory, in part, that the charge made in the petition is based.

Now the clause of the act which we are endeavoring to construe makes no distinction between such restraints of trade as are reasonable and such as are unreasonable. Hence if we should give to the words "restrictions in trade" their ordinary technical meaning, it would follow that the act made punishable all contracts in restraint of trade, however reasonable they may be. It would follow, that if one merchant engaged in the hardware business should buy out another, such other agreeing not to pursue the same business on the same block or street or in the same town for a limited time, both would be subject to the penalties affixed by the act. It is probable that the Legislature has the power to make such a law. But it is unreasonable to presume that they intended to make it; and no construction ought to be given to an act which would lead to such results, unless its language is so clear and unambiguous as to admit of no other conclusion.

It is true that article 9 of the Penal Code, already quoted, requires us to construe the act "according to the plain import of the language in which it is written, without regard to the distinction usually made between the construction of penal laws and laws upon other subjects;" but when the words employed have different meanings, one being more limited than another, it does not require that we should construe them in the more comprehensive sense.

The principle is inherent in the construction of all laws of doubtful import, that the intention of the Legislature must be sought for, and when discovered must govern. In discovering that intention, it is proper to look to the consequences of any particular interpretation, and if they be found unreasonable or oppressive, such interpretation ought to be rejected. The penalty affixed by the act in question for a violation of its provisions is a fine of not less than $50 nor more than $5000, and imprisonment in the penitentiary not less than one nor more than ten years, or by either such fine or imprisonment. Each day of the continuance of the combination is made a separate offense. The offense may be punished by confinement in the penitentiary, and is therefore a felony. We do not think that it was the purpose of the Legislature to give to the word "trade" so comprehensive a meaning as would subject all parties to contracts in restraint of trade, as these terms are understood at com-

mon law, to such heavy penalties, and conclude that the word must be construed in a more restricted sense, and as synonymous with "traffic." In this sense it embraces the buying and selling of any article of commerce, the barter of such articles, and their transportation by common carriers. But it does not embrace the business of insurance, which is trade only in the sense that it is an occupation or employment.

If, therefore, the acts charged in the petition are punishable under the statute, they must be denounced by some other provision.

Is the contract of insurance an "article of commerce" or a "commodity" within the meaning of those terms as used in the remaining four subdivisions of the statute? In Paul v. Virginia, 8 Wallace, 168, the Supreme Court of the United Stated held, that the business of insurance as carried on in one State by a company chartered by another was not commerce between the States; and the same doctrine is affirmed by the Supreme Court of Kansas. State v. Phipps, 18 Law Rep. Ann., 657. We have no reason to doubt the correctness of the conclusion. It is only by a strained construction that the word commerce can be made to embrace the business of insurance; and to say that insurance is an article of commerce is a construction still more strained. It is an aid to commerce, but not commerce itself; nor is it an article of commerce. In Nathan v. Louisiana, 8 Howard, 73, the court say, that a dealer in foreign exchange "is not engaged in commerce, but in supplying an instrument of commerce. He is less engaged in it than the shipbuilder, without whose labor foreign commerce could not go on."

The word "commodity" has two significations. In its most comprehensive sense it means "convenience, accommodation, profit, benefit, advantage, interest, commodiousness." But according to Webster's International Dictionary, the use of the word in this sense is obsolete. P. 286.

The word is ordinarily used in the commercial sense of any movable and tangible thing that is ordinarily produced or used as the subject of barter or sale; and we think that this was the meaning intended to be given to it by the Legislature in the statute in question. This clearly appears by the context. The language descriptive of the second category of offenses, "to limit or reduce the production or increase or reduce the price of merchandise or commodities," implies that a commodity is something that may be produced. So by that description of the third class, a commodity is something that may be manufactured, made, transported, and sold. In the fourth it implies something that may be sold, used, or consumed. And so also the fifth and last class relates to a commodity that is the subject of sale and transportation. Insurance is neither produced, consumed, manufactured, transported, nor sold in the ordinary signification of any of those words, and therefore it is not within "the plain import" of the language employed in the act.

But there is another point of view from which the statute in question

should be considered.   Its title is, "An act to define trusts, and to provide for penalties and punishment of corporations, persons, firms, and associations of persons connected with them, and to promote free competition in the State of Texas."   The term "trusts" is not here employed in a technical legal sense.   By very recent commercial usage this meaning of the word has been extended so as to comprehend combinations of corporations or capitalists for the purpose of controlling the price of articles of prime necessity, or the charges of transportation for the public. The formation of gigantic combinations for these purposes in late years has created alarm and excited the liveliest interest in the public mind. The amount of discussion which it has invoked, considering the time during which it has progressed, is probably without parallel.   See 2 Beach on Priv. Corp., sec. 856, and notes.   In the year 1888 the discussion seems to have become general, and in 1889 many Legislatures, including our own, made laws for the purpose of punishing and repressing such conspiracies.   2 Beach on Priv. Corp., 1351, note 2.

Notable instances of these combinations were that of the manufacturing corporations engaged in refining sugar, which was declared illegal by the Court of Appeals of New York in the case of The People v. North River Sugar Refining Company, 121 New York, 581; that of the "Cotton Seed Oil Trust" (The State v. Cotton Seed Oil Trust, 40 Louisiana Annual, 8); that of the "Diamond Match Trust" (Richardson v. Buhl, 6 Law Reporter Annual, 457); that of the "Chicago Gas Trust" (The People v. Chicago Gas Trust Company, 130 Illinois, 268); that of the "Standard Oil Trust" (Rice v. Rockafeller, 8 Railway and Corporation Law Journal, 129); that of the "Cattle Trust" (Gould v. Head, 38 Federal Reporter, 886); and that of the "Alcohol Trust" (The State v. Nebraska Distilling Company, 8 Railway and Corporation Law Journal, 323).   For other cases of like character, see Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. St., 173; Arnot v. Coal Co., 68 N. Y., 558; Santa Clara V. M. & L. Co. v. Hays, 76 Cal., 387; Clancy v. Onondega Salt Co., 62 Barb., 395; Craft v. McConoughy, 79 Ill., 346; India Bagging Co. v. Kock, 14 La. Ann., 168; Gibbs v. Baltimore Gas Co., 130 U. S., 396; Texas Oil Co. v. Adoue, 83 Texas, 650; and Anderson v. Jett, 89 Ky., 375.

The instances of combinations shown by the cases cited serve to illustrate the causes of popular discontent, and the evils which the Legislatures of several States sought to remedy by direct statutory enactments upon the subject.   They were combinations organized for the purpose of affecting the prices of articles of prime importance in commerce, or the rates of transportation and intercommunication.   The evils resulting from these operations were doubtless paramount in the minds of our legislators when they passed the statute under consideration; and it was to repress these practices that the law was enacted.   By "the plain import of its language" it makes unlawful all combinations to raise or de-

press the price of all articles of commerce whatever, or to increase or diminish the rates of transportation of such articles. It seems to us, therefore, that the words in the first subdivision of section 1 of the act, "to create or carry out restrictions in trade," were intended only as a general expression of the purpose of the law, and that the acts defined in the subsequent members of the section were intended as a specific definition of what was meant in the first.

The National Benefit Company v. The Union Hospital Company, 11 Law Reporter Annual, 437, was a case involving the question of a partial restraint of trade, and in their opinion the court say: "There are two classes of cases, some of which appellants have cited, which are often confounded with but are clearly distinguishable from cases like the present, and stand upon entirely a different footing. This one is a combination between producers and dealers to limit the production or supply of an article, so as to acquire a monopoly of it, and thus unreasonably enhance prices. The other is where a corporation of a quasi-public character, charged with a public duty, as a railway company, gas company, or the like, enters into a contract restrictive of its business, which would disable it from performing its duty to the public." We think it was to combinations of the character described in these remarks that our statute was intended to apply, and not to combinations of persons engaged in any employment which may be restrictive of that business.

But it is a rule of construction, that each word and sentence should be presumed to be intended for a purpose, and that each should be given effect; and it may be argued, that our construction destroys the effect of the words in the first clause, and that under such construction they might have been omitted without changing the meaning of the section. But the argument defeats itself. If the words "restrictions in trade" are not to be limited in their meaning, then all the subsequent parts of the section were unnecessary, and may have been omitted without altering the sense. Every act therein defined is clearly a restriction in trade, in the most comprehensive meaning of those terms. The same argument may be made in reference to the words "article" and "commodity," and it may be said they should be construed to have a different meaning. But if the word "commodity" was employed in its broadest meaning, it embraced "article," and the latter might have been omitted. The fact is, the section of the act under consideration abounds in tautology, and its general structure is such that rules based upon grammatical niceties should not prevail over broader and more liberal rules of construction.

Our conclusion is, that the case stated in the petition does not come within the provisions of the statute; but we are not prepared to concur with the Court of Appeals in holding that the whole act is inoperative. It is true that while trusts are defined in the first section, nowhere, either in that or any other section, are they expressly declared unlawful. The

following sections provide forfeitures for corporations and punishment for persons who " violate any of the provisions " of the act, but they do not designate what shall constitute a violation of its provisions in any direct terms. Confining ourselves to the letter of the law, there is a clear hiatus—a lack of connection in its provisions.

But the Legislature evidently intended to affix a punishment to some acts, and it is reasonable to presume that the acts they have defined were those intended to be forbidden. This intention is made more evident by the sixth section, which declares that a violation of the provisions of the act is " a conspiracy against trade," etc.; also by the seventh, which provides, that it shall be sufficient in an indictment under the act " to state the purposes and effect of the trust or combination, and that the accused was a member of and acted with or in pursuance of it, without giving its name or description, or how, when, or where it was created." The eighth section also provides that it shall be sufficient to prove upon the trial that " the trust or combination, as defined herein, exists, and that the defendant belonged to it, or acted for or in connection with it, without proving all the members belonging to it," etc.

There is no express declaration that trusts were unlawful; the acts which are declared to constitute a trust are not expressly made punishable; nor is any act expressly declared to be a violation of the provisions of the statute; yet the language is sufficient, we think, to manifest unmistakably the intention of the Legislature to punish as offenses some of the acts defined in the first section; and it is but reasonable to conclude that the purpose was to subject them all to a like punishment. The intention of the Legislature is the aim of statutory construction, and where, though not expressed, it is clearly manifested by implication from the language used, we can not say that it should not have effect. That which is not expressed in words may be " plainly imported " by implication.

We have deemed it proper to say this much upon this question, although its determination, in our opinion, is not necessary to a decision of this case. The other question as to the validity of the statute involves a construction of the Constitution, and we do not feel called upon to determine it. The decision of a grave constitutional question, although involved in a case, is properly pretermitted until a controversy arises in which such decision becomes necessary to its disposition.

Having determined that the acts charged against the defendants are not embraced within the provisions of the statute, it becomes necessary to decide whether or not they are unlawful at common law. We have found no direct decision in any court of last resort upon the point. The decisions upon cases involving similar questions are not altogether harmonious.

We have seen that contracts in unreasonable " restraint of trade " are illegal in the sense that they are not enforceable. Of these there is a well

defined class—those in which the parties seek to bind themselves by an agreement that one of them shall cease to pursue his vocation. The terms are usually employed by the courts in this sense. It is clear that the combination in question is not of this class. But employing the terms in a looser sense, it is frequently said that agreements to raise or depress prices, between persons engaged in the same business, is a combination in restraint of trade. That such contracts, as applied to certain kinds of business, are unlawful in the sense that they are not valid, there is no doubt; but whether the rule extends to every class of business is a different question. It extends to a business in which the public have a right, as distinguished from a business which may be merely beneficial to the public. Such is the carrying trade, and especially the business of transportation by railroad and communication by telegraph. Railroad and telegraph companies derive their right to condemn property from the fact that their business is established for a public use. So the business of gas companies who have acquired a right to lay their pipes in the public streets, in analogy to that of railway companies, is treated as public. People v. Chicago Gas Co., 8 Law Rep. Ann., 497.

Thus far we may clearly see our way; but when we come to a business not public in its character in the sense previously indicated, the difficulties arise. We take it as being well settled, that all combinations among dealers in provisions or other articles of prime necessity are deemed in law contrary to public policy, and contracts to effect or carry out such combinations are held void. India Bagging Co. v. Kock, 8 La. Ann., 168; Santa Clara M. & L. Co. v. Hays, 76 Cal., 387; Coal Co. v. Coal Co., 68 Pa. St., 173.

Combinations of this character are commonly called monopolies, but they are not the technical monopolies known to the common law. 4 Black. Com., ch. 12, sec. 9. The doctrine that they are illegal probably had its origin in the laws against forestalling, regrating, and engrossing—offenses which at a very early day in England were made punishable by statutes which have since been repealed. They were probably offenses at common law, though their precise nature, as defined in that system, seems to be obscure. 1 Bish. Crim. Laws, 8 ed., sec. 525. According to Blackstone, forestalling was defined by the statute " to be the buying or contracting for any merchandise or victual coming in the way to market; or dissuading persons from bringing their goods or provisions there, or persuading them to enhance the price when there; or of any practices to make the market dearer to the fair trader;" and regrating " to be the buying of corn or other dead victual in any market and selling it again in the same market or within four miles of the place." Engrossing is " the buying up large quantities of corn or other dead victual, with intent to sell them again."

As we have said, these statutes have been repealed in England. They

were applicable to a condition of society which no longer exists. But it is to be presumed that the common law principle which underlies them is the origin of the modern doctrine on the subject.

We find that in most of the cases in which agreements among manufacturers and dealers to increase the price of their wares and commodities related to some merchantable article of necessity or of great utility. In the case of the India Bagging Company v. Kock, supra, it is said in the opinion, that bagging is an article " of prime necessity" to cotton planters. In the elaborate opinion delivered in the trial court in the Sugar Refining case, Judge Barrett lays stress upon the fact that sugar is "a necessary article of commerce." The People v. Refining Co., 2 Law Rep. Ann., 33. So also in the opinion in the same case in the Supreme Court. 52 Law Rep. Ann., 386. In the opinion in the same case in the Court of Appeals the question was not discussed, it not being deemed necessary to a decision of the case. 121 N. Y., 582. In Richardson v. Buhl, 6 Law Reporter, 457, the court also say " the article" in controversy " has come to be regarded as one of necessity not only in every household in the land, but one of daily use by almost every individual in the country." Similar expressions may be found in other cases.

On the other hand, in Central Shade Roller Company v. Cushman, 143 Massachusetts, 353, an agreement between three manufacturers of " shade rollers" to control the manufacture and sale of their products was held not unlawful, distinctly upon the ground that their wares were not articles of " prime necessity." The doctrine was adhered to and reaffirmed by the same court in the subsequent case of the Gloucester Isinglass and Glue Company v. Russia Cement Company, 154 Massachusetts, 92. In the latter case the court say: " Their contract had no relation to an article of prime necessity or to staple commodities ordinarily bought and sold in market." In most of the cases in which agreements between persons doing a business not of a public character have been held contrary to public policy and void, the contracts related not only to articles of commerce, but to staple commodities.

Insurance is a mere contract of indemnity against a contingent loss. Though it is an important aid to commerce, it is not a business of commerce, or one in which the public have any direct right. No franchise is necessary for its prosecution, and no one has a right to demand of an underwriter that his property shall be insured at any rate. Any individual may execute a policy, and so any company incorporated for the purpose of insuring property may refuse to execute one, unless it be so bound by its charter. Forced insurance, for obvious reasons, is detrimental to the public interest, and it is therefore not probable that such restriction will be found in any charter.

Labor is necessary to production and transportation, and therefore it is not merely an aid, but a necessity of commerce. It is advantageous to

the public, and in that sense they have an interest in it. The services of professional men are likewise indispensable in most civilized communities, and are presumably likewise advantageous to the public. The public have an interest in them, in the same sense in which they have an interest in the business of insurance.

It follows, therefore, that if insurance companies are to be brought within the rule that makes agreements to increase the price of merchandise illegal, upon the ground that the public have an interest in their business, agreements among laborers and among professional men not to render services below a stipulated rate should be held contrary to public policy and void, upon the same ground.

Combinations among working men to increase or maintain their wages by unlawful means are unlawful. But are such combinations unlawful when the only means resorted to to accomplish their objects is a refusal on part of the parties to the agreement to accept employment at a lower rate of wages than that designated in the contract? This is the next question for determination, and it is not without difficulty.

In treating of criminal conspiracies, Mr. Bishop says: "Whatever the language of some of the old cases, no lawyer of the present day would hold it indictable for men simply to associate to promote their own interests or specifically to raise their wages. If the means adopted were mutual improvement of their mental or physical powers, mutual instruction in their methods of doing their work, mutual acquiring and imparting information as to the wages paid in other localities, or anything else of a like helpful nature, severally enabling the members to obtain higher wages, nothing could be more commendable and nothing further from the inhibition of the law. Or if employers should combine simply to reduce wages, not proposing any unlawful means, perhaps we might not so much commend them, yet still they would stand under no disfavor from the law. The result of which is, that a conspiracy to enhance or reduce wages is not indictable per se, while yet it may be so by reason of proposed unlawful means." 2 Bish. on Crim. Law, sec. 2332. The author then proceeds to consider certain means which have been determined to be unlawful—in which a mere agreement by men not already under contract not to work unless for a certain rate of wages does not seem to be included.

But the matter seems to be involved in some obscurity. In a previous section the author cites the remarks of distinguished English judges, including Lord Mansfield, to the effect that such agreements are unlawful in themselves; but adds: "In a later case, Erle, J., perhaps with a view to conforming to the statute of 6 George IV, chapter 129, section 4, yet distinctly qualifying the words of Lord Mansfield, stated it as settled, ' that workmen are at liberty, while they are perfectly free from engagement and have the option of entering into employ or not, to agree among

themselves to say, We will not go into any employ unless we can get a certain rate of wages.' "

Mr. Freeman, in his note to the case of The People v. Fisher, says: " Recent decisions in England, and the spirit now prevailing there and in this country of giving encouragement to workmen in their endeavors to associate themselves into organizations for their mutual benefit, have settled beyond question that unemployed workmen may unite and agree not to work unless for a certain price. This is a plain right, upon which no doubt ought ever to have existed." 28 Am. Dec., 508. The learned annotator then quotes: "The law is clear, that workmen have a right to combine for their own protection, and to obtain such wages as they may choose to agree to demand." Citing Reg. v. Railands, 5 Cox C. C., 436, 460.

In Commonwealth v. Hunt, 4 Metcalf, 111, it was held by the Supreme Court of Massachusetts, that an association among journeymen boot-makers, in which they bound themselves not to work for any person who employed one not a member of the association, was not indictable at common law. Following that decision, that court also held, in Bowen v. Matheson, 14 Allen, 499, that an agreement among certain defendants by which they sought to compel the plaintiff, a shipping master, among other things, to ship men from them at an established rate of wages, was not illegal and did not give a ground of action, although the plaintiff's business had been damaged by the conspiracy. So also, in Caren v. Rutherford, 106 Massachusetts, 10, they say that " it is no crime for any number of workmen to associate themselves and agree not to work for or deal with certain men or certain classes of men, or work under certain wages, or without certain conditions."

We take it, therefore, that the weight of authority is against the proposition that such a combination among workmen is indictable at common law. It does not follow, however, that any agreement of that character is not against public policy and therefore void. But it is proper to show that it was not an indictable offense at common law; for if so, any contract in pursuance of such an agreement would have been illegal, in the sense that it would not be enforceable in the courts.

Upon the question whether an agreement among workmen to raise their wages is contrary to public policy, as being in restraint of trade, there is some conflict in the authorities. In Collins v. Locke, 4 Appeal Cases, 674, the Judicial Committee of the Privy Council held, that a contract between stevedores in a certain port, by which they agreed to parcel out the stevedoring business, was not void as a contract in restraint of trade at common law. The court say: " The objects which this agreement has in view are to parcel out the stevedoring business of the port amongst the parties to it, and so to prevent competition at least amongst themselves, and also, it may be, to keep up the price to be paid for the work. Their

lordships are not prepared to say that an agreement having these objects is invalid if carried into effect by proper means, that is, by provisions reasonably necessary for the purpose, though the effect of them might be to create a partial restraint upon the power of the parties to exercise their trade."

In the Master Stevedores' Association v. Walsh, 2 Daly, 1, which was a civil action, it was held, that it was not unlawful for workmen to agree that they would not work below certain rates, and that a by-law of an association which provided a pecuniary penalty for the violation, by way of a fine, could be recovered. The decision was not by a court of last resort, but the opinion is able, learned, and exhaustive, and, as it seems to us, convincing. See also, Sayre v. Louisville Ben. Assn., 1 Duvall (Ky.), 133.

In Ladd v. The Cotton Press Company, 53 Texas, 172, it was also decided, in effect, that a combination among the compressing companies in the city of Galveston by which they increased the prices for compressing cotton was not unlawful. This proposition is based distinctly upon the ground that compressing cotton is not a public business.

On the other hand, it is held by the Supreme Court of Illinois, in Moore v. Bennett, 15 Law Reporter Annual, 361, that an association of stenographers, one of the objects of which was to control prices to be charged for work by its members, is an illegal combination, and that its rules would not be enforced so as to sustain an action of one member against another. The cases cited all relate to combinations between carriers or dealers or producers of the staple articles of commerce, as the opinion itself shows. The court also quote from Tiedman on Commercial Paper, section 190, as follows: "All combinations of capitalists or of working men for the purpose of influencing trade in their especial favor by raising or reducing prices are so far illegal that agreements to combine can not be enforced." The cases cited by this author do not sustain the proposition. Morris Run Coal Company v. Barclay Coal Company, 68 Pennsylvania State, 173, was a combination to affect the price of coal. Stanton v. Allen, 5 Denio, 434, was an association composed of the proprietors of canal boats to regulate the rate of transportation. In the other cases cited—Britain v. Adams, 3 New York, 129; Noyes v. Day, 14 Vermont, 384; Doolin v. Ward, 6 Johnson, 194; and Thompson v. Davies, 13 Johnson, 112—it is simply held that agreements to prevent competition in bidding at auction sales are contrary to public policy, and therefore void. Combinations of that character tend to affect the price of the thing to be sold, and directly to defraud the owner. In his work on Sales, the same author lays down the same proposition, and attempts to sustain it by the same authorities. Teid. on Sales, sec. 303. Notwithstanding our great respect for the court which made the decision, we can

not concur in the doctrine announced in the case of Moore v. Bennett. It is opposed to the well considered cases on the same point which we have previously cited, and which, as we think, lay down the correct rule.

Now the business of the stevedores is essential to maritime commerce, and that of compressing cotton is an important aid to traffic in that staple. In that particular neither are secondary to the business of insurance. The public has an interest in the one, just as it has in the others; and if it be law, those engaged in loading ships and in compressing cotton may combine to regulate their charges, we see no good reason why insurance companies may not combine for a similar purpose. The same may be said of lawyers, physicians, dentists, and others pursuing like occupation in which many persons may have an interest in the services to be performed.

But there is a stronger reason for holding combinations to enhance prices among those engaged in occupations which are licensed and are protected from unlicensed competition illegal, than among those of whom no such license is required. In Morris Run Coal Company v. Barclay Coal Company, 68 Pennsylvania State, 173, Judge Agnew, who delivered the opinion, puts the case very strongly against a combination among the coal companies to control the market; and yet says: "To fix a standard of prices among men in the same employment, as a fee bill, is not in itself criminal, but may become so when the parties resort to coercion, restraint, or penalties upon the employe or employers, or what is worse, to force of arms." For these reasons, we conclude that the combination in this case is not illegal at common law.

But if it should be determined that the combination charged in the petition is so far illegal as to make any contract growing out of it void at common law, we are not prepared to say that it would either subject the corporations engaged in it to a forfeiture of their franchises, or to be enjoined at the suit of the State. The application of either rule would result in grave consequences. A corporation which exceeds its powers in an important particular commits a breach of an implied condition of its contract, and may be properly held subject to the penalty of a forfeiture.

But the sanction of a rule of law which holds a contract not made punishable merely void as against public policy, is ordinarily simply to refuse the parties any remedy for its enforcement; and it may be doubted whether the courts would interfere to enjoin their performance. The courts may command parties to a legal contract in restraint of trade to refrain from violating its provisions; but can they enjoin a party to a contract merely void to refrain from its performance? The rule is to leave the parties as they have left themselves. If the contract be executory, a court will not enforce it in favor of one claiming under it; if executed, it will not rescind it at the suit of a party claiming against it. The public policy which creates the rule in these cases, it seems to us, has

gone no further in providing a sanction for its enforcement than to refuse a remedy in the courts to either party to the agreement.

The North River Sugar Refining case was tried, and appealed to the Supreme Court en banc, and thence an appeal was taken to the Court of Appeals. It was stubbornly contested, and argued with distinguished ability on both sides at every stage of its progress. In the opinion of the trial judge stress is laid upon the fact that the tendency of the combination was to create a monopoly in restraint of trade. 2 Law Rep. Ann., 33. In the Supreme Court this is made a principal ground upon which the opinion of the court is based. The opinion recognized that it was a conspiracy in restraint of trade under the statute of New York, and an indictable offense. 5 Law Rep. Ann., 386. But it is notable that the Court of Appeals expressly waive any consideration of that question, and hold that the defendant corporation had subjected its charter to forfeiture, by reason of its having exceeded its powers in forming with other corporations a trust in the nature of a partnership. It may be that to restrain a party from performing a contract merely void at common law as being contrary to public policy, would be to violate the rule, which leaves all the parties to suffer the consequence of their improvident engagements of such a character, and gives relief to none. But this would not apply if the interest of a third person was to be affected. The question is not without difficulty, and since its determination is not necessary to this case, we do not decide it. It may be that a thorough examination of the authorities would show that it is settled.

We would not be understood as holding that the combination disclosed in this case is not detrimental to the public, and that sound policy does not demand the suppression of that and like organizations of a similar magnitude. There are certain contracts, and perhaps combinations, which the law regards as being against public policy. The courts can not extend the rule merely by reason of their opinion as to what the law ought to be. What other combinations or contracts should be held illegal on the ground of public policy, is a political question—that is to say, one which it is the province of the legislative department of the government to determine. The Legislature has power to weigh the public interest even "in golden scales," and if such combinations be found detrimental, they can denounce the evil and provide the remedy.

It follows, that we are of opinion that this action can not be maintained, and therefore the judgments both of the Court of Civil Appeals and of the District Court are reversed, and judgment is here rendered for the defendants in the latter court, the plaintiffs in error in this court.

*Reversed and rendered.*

Delivered December 14, 1893.