## SPENCE v. JOHNSON.

1. In a suit for slander, if the words spoken do not impute a crime, the mere general allegation that they do so is demurrable.

(a) If words are susceptible of two constructions, one of which is inno-cent, and the other charging a crime, by proper allegations as to the circumstances and meaning intended a question for the jury may be raised; but if language is neither doubtful nor ambiguous, its meaning can not be enlarged by an innuendo.

2. One who conducts a general farming business is included in a proper interpretation of that division of the Civil Code of 1910, § 4433, which declares that slander may consist in charges made in regard to another "in reference to his trade, office, or profession, calculated to injure him therein," and that in such a case it is not essential to show special damage in order to support the action.

(a) The allegations, except as indicated in the first headnote, were sufficient to withstand a demurrer.

August 18, 1914.

Action of slander. Before Judge Walker. Warren superior court. April 7, 1913.

E. R. Spence brought an action of slander against J. L. C. Johnson, alleging, among other things, as follows: "Petitioner shows that on the 5th day of April, 1912, and for several years prior thereto, and from thence hitherto, he was, and still is, a farmer, conducting and carrying on a general farming business. Petitioner further shows that heretofore, to wit, on the 5th day of April, 1912, at Warrenton, in said county, in a certain discourse which the said defendant then and there had of and concerning the said plaintiff and of and concerning him in his trade and business, in the hearing and presence of divers worthy and good citizens, falsely and maliciously spoke publicly of and concerning your petitioner, and of and concerning him in reference to his trade and business, the false, scandalous, malicious, and defamatory words following, that is to say, he, meaning the said plaintiff, had gained his lawsuit, meaning the lawsuit to compel the defendant Johnson to comply with a contract of sale of some land, but that he (your petitioner) would not make anything by it, as he (meaning your petitioner) would have to borrow the money to pay for the land (meaning the land involved in the suit for specific performance); that he (meaning your petitioner) would never own it (meaning the land involved in the suit for specific performance), and he (meaning your petitioner) might as well be working for me (mean-

ing the defendant) as anybody else; Spence (meaning your petitioner) was no account no how, that Spence (meaning your petitioner) would not do what he said he would. He (meaning your petitioner) come here (meaning Warrenton) and made a contract with Bob Williford to sell his (meaning your petitioner's) cottonseed, and to deliver them in the fall, and when he (meaning your petitioner) brought the cottonseed up here (meaning Warrenton) he was slipping them off (meaning your petitioner) and didn't deliver the seed to Williford and wouldn't pay Williford the money (meaning Robt. Williford the man who advanced the money to petitioner on his cottonseed). Petitioner further avers that the above and foregoing alleged defamatory words, impute and charge your petitioner with a crime against the laws of said State, to wit, that of cheat and swindler. Petitioner further alleges that the defendant knew that the terms of the judgment in favor of your petitioner in the suit against the defendant for specific performance which was rendered at the April term, 1912, of said court, required your petitioner to raise the sum of eight hundred and three dollars within ten days from the date of said judgment, in order to obtain the benefits under said judgment. That the defendant knew at the time that the defendant uttered and published the above alleged scandalous and defamatory words of and concerning your petitioner, your petitioner had not been able to raise the above amount in accordance with the terms of said judgment; that defendant knew that petitioner was a poor boy and was financially unable to pay the amount of said judgment, but would have to secure some one to do so for him. Therefore petitioner alleges and charges that at the time that the said defendant spoke and uttered the above set out defamatory and untrue words of and concerning your petitioner, that he (the defendant) did so thereby hoping to so defame your petitioner that petitioner would be unable to comply with the judgment in his favor in the above described suit. Petitioner further alleges that the use of the above set out defamatory, scandalous, false words by the defendant of and concerning your petitioner was done with malice and with the malicious intent to injure and damage your petitioner."

The court sustained a general demurrer to the petition, and the plaintiff excepted.

*L. D. McGregor,* for plaintiff.

*E. P. Davis* and *M. L. Felts,* for defendant.

LUMPKIN, J. Spence brought an action against Johnson to recover damages for an alleged slander. The suit was dismissed on demurrer, and the plaintiff excepted.

1. One paragraph of the petition alleged that the defamatory words previously set out charged the plaintiff with a crime against the laws of the State, namely, that of being a cheat and swindler, and imputed such crime to him. This allegation was properly stricken on demurrer. It was neither an allegation as to facts preceding or surrounding the alleged slander, nor as to the meaning which the defendant intended to convey by the use of certain words,—what are termed in the language of the law a colloquium and innuendo. Moreover, the office of an innuendo is to explain what is of doubtful or ambiguous meaning in the language employed in an alleged libel or slander, but it can not enlarge the meaning of the words plainly expressed therein. If such language is plain and unambiguous, and does not impute a criminal offense, its meaning can not be enlarged and extended by an innuendo. If it is capable of being understood in a double sense, the one criminal and the other innocent, the plaintiff may by proper allegation aver the meaning with which he claims that it was published, and the jury may find whether it was published with that meaning or not. *Park* v. *Piedmont &c. Insurance Co.,* 51 *Ga.* 510, 513. In the case at bar the words alleged to have been spoken did not charge a crime but a breach of contract, and that the plaintiff would not keep his word and was of no account. No charge of criminality appears on the face of the language employed, and there is nothing alleged from which an intent to charge a crime could be inferred. Therefore the mere direct allegation that the language charged a crime was demurrable.

2. It was further contended on behalf of the defendant, that the words spoken were not actionable per se; that farming was not a trade, office, or profession; that the petition failed to set forth any language in reference to the trade, office, or profession of the plaintiff; and that no special damages were alleged. Every man has a right to the enjoyment of a good reputation unassailed, as he has a right to life, liberty, or property. It was long ago said that

SPENCE *v.* JOHNSON.

"A good name is rather to be chosen than great riches." Prov. XXII: 1. A suit for defamation is based on the injury done to reputation. Libel and slander are both methods of defamation. The former is expressed by print, writing, pictures, or signs; the latter is expressed orally. On account of the greater deliberation and permanency of a libel, the courts came to hold certain things to be libelous per se which would not have been sufficient as the basis of an action of slander without showing special damage. It has been doubted whether such a distinction should have been drawn originally, but it has become firmly fixed. Of course, if words are slanderous, they would not become less defamatory by publishing them in writing, though words which might not be actionable per se as slander may be libelous per se when put in writing or print. In some of the discussions this distinction has been overlooked, and the question of whether language was libelous has been treated as though libel and slander were identical.

The Civil Code of 1910, § 4433, reads as follows: "Slander, or oral defamation, consists, first, in imputing to another a crime punishable by law; or, second, charging him with having some contagious disorder, or being guilty of some debasing act which may exclude him from society; or, third, in charges made on another in reference to his trade, office, or profession, calculated to injure him therein; or, fourth, any disparaging words productive of special damage flowing naturally therefrom. In the latter case, the special damage is essential to support the action; in the three former, damage is inferred." We have already held that the plaintiff's petition did not show that the defendant imputed to him a crime punishable by law. It did not fall within the second division of the code section above quoted. No special damages were alleged. Accordingly, whether the demurrer to the petition was properly sustained depends on whether the allegations are sufficient to show "charges made on another in reference to his trade, office, or profession, calculated to injure him therein." It was not claimed that the plaintiff held an office or was engaged in a profession. The determination of the case therefore rests upon the inquiry whether the petition set out charges made against the plaintiff "in reference to his trade," calculated to injure him therein. It was contended that farming was not a trade within the meaning of the code

section above set out. This section did not arise from a legislative act, but was a codification of the common law. It is therefore permissible to consider the meanings which have been given to the word "trade," in order to determine in what sense it was employed by the codifiers, and by the legislature in adopting the code. If the etymology of the word "trade" be considered, it originally meant a track or course, and this meaning still survives in the word "trade-wind." Hence, it came to mean a way of life, business or occupation, and specially a handicraft by which one earns a livelihood, or a mercantile business, as opposed to the liberal arts or professions. A still further development makes the word synonymous with commerce. Encyclopædia Britannica, word "Trade."

In Queen Insurance Co. v. State, 86 Texas, 250 (24 S. W. 397, 22 L. R. A. 483, 490), Gaines, J., said: "In ordinary language, the word 'trade' is employed in three different senses: First, in that of the business of buying and selling; second, in that of an occupation, generally; and, third, in that of a mechanical employment, in contradistinction to agriculture and the liberal arts. Ordinarily, when we speak of 'trade,' we mean commerce, or something of that nature; when we speak of 'a trade,' we mean an occupation, in the more general or the limited sense." One of the definitions given of the word by lexicographers is "any occupation or employment pursued as a calling; business," though it is stated that it especially applies to "mechanical employment as distinguished from the liberal arts, the learned professions, and agriculture." Webster's Dictionary, word "Trade."

In *Woodfield* v. *Colzey*, 47 *Ga.* 121, 124, a statute was construed which declared that the accounts of merchants, tradesmen, and mechanics, which by custom become due at the end of the year, should bear interest from that time. It was declared that while the word "tradesmen" does not, perhaps, ordinarily cover physicians, the legislature would not be presumed to have passed laws for the benefit of special trades or occupations, unless it so appeared; and it was held that a physician came within the meaning of the word "tradesmen," as used in that statute. In *Powers* v. *Rosenblatt*, 113 *Ga.* 559 (38 S. E. 969), a stock of goods was set apart as an exemption to the head of the family, and he, without an order of court, continued to carry on a mercantile business and

sold the goods and bought others with the proceeds thereof, and still others on a credit extended by merchants who had notice of the exemption. It was held, that, in view of the restrictions imposed by the laws of this State in regard to the sale of exempted property, the head of the family could not, as such, be a trader within the meaning of the insolvent traders' act. These citations will show that, in construing laws, the meaning with which the word trader is used in the particular statute is to be sought, and that it will not necessarily be limited by the definitions or criticisms of verbalists. In Odgers on Libel and Slander (5th ed.), 65, it is said: "So if the plaintiff carry on any trade recognized by the law, or be engaged in any lawful employment, however humble, an action lies for any words which prejudice him in the way of such trade or employment. But the words must relate to his trade or employment, and 'touch' him therein." The author cites numerous English cases involving different occupations which might not be trades in a restricted sense. Thus one case was that of a gamekeeper, another that of a servant girl, and another that of an innkeeper. In State *v.* Hunt, 129 N. C. 686 (40 S. E. 216, 85 Am. St. R. 758), it was held that an emigrant agent who hired laborers to be employed in another State was exercising a trade or profession within the meaning of the clause of the North Carolina constitution dealing with the taxing power. In Ohio & M. Ry. Co. *v.* Press Pub. Co., 48 Fed. 206, Lacombe, Circuit Judge, held that language which charged a railroad company with such incapacity or neglect in the conduct of its business that belief in its truth would prevent persons from employing it as a common carrier furnished a basis for an action of libel by the company, without proof of special damages. He said: "It is elementary law that every legal occupation from which pecuniary benefit may be derived creates such special susceptibility to injury by language charging unfitness or improper conduct of such occupation that such language is actionable, without proof of special damage." While this was said in reference to an action for libel, it may properly be quoted here as bearing on the question of the broad view which has been entertained in regard to language concerning one in reference to his trade or occupation. See also 25 Cyc. 3269.

In Barnes *v.* Holloway, 8 T. R. 150, to say falsely of a farmer, "he can not pay his laborers," was held to be actionable. There

were certain allegations of consequences resulting from the state-ment; but from the meager report it does not appear that special damages were set out. In Rathbun *v.* Emigh, 6 Wend. 407, Sav-age, C. J., said: "It has been held, that to say of a farmer or carpenter that he is broken or run away is actionable, because credit may be necessary to the successful prosecution of his busi-ness." But it was held, that, unless the usual manner of transact-ing business was by selling on a credit, not to a few individuals only, but generally, as is the practice with merchants and mechan-ics, the keeping of books was not necessarily incidental to the busi-ness, and therefore a charge of keeping false books by a farmer, or a sawyer of lumber and dealer therein, was not actionable per se.

The rule that words falsely spoken of one in reference to his trade, office, or profession are actionable per se is not merely an arbitrary one. It grows out of the fact that the position of a per-son may render him peculiarly subject to injury; that words may have an added likelihood to do injury when said of one in reference to a trade, office, or profession, rather than when merely said of him as an individual; and that, where it touches such person in that position, it tends directly to injure him in his vocation or occupation. In Townsend on Slander and Libel (2d ed.), 223, occurs the following discussion of the subject: "It is not possible to particularize the special characters which entail this greater degree of liability to injury, but it may be stated generally that every legal occupation or position from which pecuniary benefit may or possibly can be derived will create in the follower of such occupation, or the holder of such position, that peculiar or special susceptibility to injury by language to which reference has already been made; and hence results this rule, that language concerning one in any such lawful occupation or position may, as a necessary consequence, occasion him damage, which would not have that con-sequence if it concerned him as an individual merely; and there-fore, as heretofore (§ 132) observed, language which would not be actionable if it concerned only an individual as such, may be actionable if it concerns him in his special character. The rule which makes language concerning one in a special character some-times actionable, when the same language concerning one as an in-dividual merely would not be actionable, is in reality nothing more

than a phase of the rule (§ 134) that language connected with any fact, affecting its meaning or effect, must be construed in connection with such fact. The language, being connected with the fact of the special character of the person whom it concerns, must be construed in reference to such special character."

No legitimate reason occurs to us why the legislature should have intended so to change the law that, while protecting merchants, school-teachers, carpenters, blacksmiths, and others from defamation in regard to their occupations, the farmer should be excluded from its protection. He is within the reason of the rule, and we think within the rule itself. In the case before us it was alleged, that the plaintiff was a farmer, conducting and carrying on a general farming business; that the defendant falsely and maliciously stated in the hearing of others, "of and concerning the said plaintiff, and of and concerning him in his trade and business," certain things, among them being that the plaintiff was of no account, that he would not do what he said he would do, that he made a contract with a named person to sell his (plaintiff's) cottonseed, and to deliver them in the fall, and that when he brought the cottonseed to town "he was slipping them off," and did not deliver them to the purchaser, and would not pay "the money" (meaning the money advanced by the purchaser to the plaintiff on account of his cottonseed). As against a demurrer, these allegations are sufficient to show that the words were used concerning the plaintiff in reference to his "trade" or business. It is matter of common knowledge that credit and good reputation are important, if not essential, to one who conducts a general farming business. To charge him with being of "no account," and not doing what he promised, and with trickery in disposing of his products and retaining money advanced, is calculated to injure him in his "trade" or business. Some of the charges alleged to have been made were of that character, and were expressly alleged to have been falsely and maliciously made of the plaintiff in his trade and business. It was accordingly erroneous to dismiss the petition on demurrer.

*Judgment reversed in part and affirmed in part. All the Justices concur.*