

# THE ATTORNEY GENERAL

## OF TEXAS

### AUSTIN 11, TEXAS

WAGGONER CARR
ATTORNEY GENERAL

April 4, 1963

Honorable Grainger McIlhany　　　Opinion No. C-52
Chairman
Land Study Committee　　　　　　Re:　Whether, in view of the
House of Representatives　　　　　　prohibitions, restrictions
Austin, Texas　　　　　　　　　　　and reverters in H.B. 6,
　　　　　　　　　　　　　　　　　Chapter 68, 36th Leg.; H.B.
　　　　　　　　　　　　　　　　　164, Chapter 40, 47th Leg.;
　　　　　　　　　　　　　　　　　and H.B. 492, Chapter 253,
　　　　　　　　　　　　　　　　　49th Leg., the Glasscock
　　　　　　　　　　　　　　　　　Fill Area, located in Corpus
　　　　　　　　　　　　　　　　　Christi Bay, has reverted to
Dear Sir:　　　　　　　　　　　　the State and related questions.

　　　　You request an opinion of this office in regard to
"The Glasscock Fill Area located in Corpus Christi Bay and pre-
sently claimed by private individuals with a chain of title
from Corpus Christi." Your request presents the following ques-
tions, "in view of the prohibitions, restrictions and reverters"
in the Acts referred to in your letter, and herein.

　　　　1.　Whether the Glasscock Fill Area has reverted to
the State.

　　　　2.　Whether the Glasscock Fill Area, in view of the
restrictions as to the public use and benefit, can be lawfully
conveyed by the City of Corpus Christi for private use and
benefit.

　　　　3.　If the land has not been forfeited back to the
State, what interest the State of Texas and the general public
presently have in the above referred to land.

　　　　It occurs to us that the true answers to these ques-
tions must be found in a correct interpretation and construc-
tion of the legislative enactments herein referred to.

　　　　House Bill No. 6, Chapter 68, approved March 17, 1919,
entitled:　"Granting to the City of Corpus Christi certain land
lying under the waters of Corpus Christi Bay," contained the
following provisions pertinent to the questions presented:

-237-

"Section 1.   All right,title and interest
of the State of Texas to all the land herein-
after in this section described lying and being
situated under the water of Corpus Christi Bay
and within the corporate limits of the City of
Corpus Christi, Texas, is hereby granted to the
said city for public purposes only; said land
so granted being described as follows:   All
land west of the line beginning at a point in
the northern boundary line of the corporate
limits of said city of Corpus Christi, Texas,
one thousand feet (1,000) from the point of
intersection of said northern boundary line
with the present shore line of Corpus Christi
Bay; thence in a southerly direction to a point
in the Southern boundary line of the corporate
limits of said city one thousand feet (1,000)
east from the point of intersection of the said
Southern boundary line with the present shore
line of said Bay.

"Sec. 2.   The city of Corpus Christi is
hereby granted the right, power and authority
to locate,  construct, own and maintain within
said territory hereby granted such sea walls or
break waters as may be necessary or desirable
into the waters of Corpus Christi Bay, and to
fill in the space between the said main land and
the sea walls or break waters of Corpus Christi
Bay, having first secured a permit from the
Federal Government therefor and all area formed
by such construction and filling in is hereby
declared to be the property of the City of Corpus
Christi to be used by said city for public pur-
poses only, and said city shall have the right,
power and authority to construct such walks, drives,
parks and buildings for public purposes only on
all of such area as may be deemed suitable or
desirable for such public purposes, and any such
building or structure erected may be rented for
purposes of a public nature and all proceeds de-
rived from such rental shall be paid into the
general fund of the city; provided, however, that
the city of Corpus Christi shall not have the
right to take from Corpus Christi Bay any sand,
dredge spoil or other material except such as may

be necessary for the purpose of filling in
between said sea walls or break waters and
the main land, and provided that the City of
Corpus Christi shall not place or permit the
placing of any building other than for orna-
mental or civic purposes on said area, except
within the shipping district as hereinafter
defined.

"* * *

"Sec. 8. All mines and minerals and
mineral rights including oil and gas in and
under said land, together with the right to
enter thereon for the purpose of development,
are hereby expressly reserved to the State of
Texas.

"Sec. 9. This grant to the City of Corpus
Christi is upon the express condition, that said
city shall within five years from and after the
passage of this Act, begin the construction of
said sea wall and shall within a period of ten
years complete same, and failure to do so shall
forfeit the grant.

"Sec. 10. Before the City of Corpus Christi
shall begin the improvement herein contemplated,
the Commissioner of the General Land Office shall
fix a price per acre upon the area herein granted,
and when the improvement herein contemplated shall
have been completed, a showing of that fact shall
be made to the Commissioner of the General Land
Office, and the said City of Corpus Christi shall
then pay to that officer for the benefit of the
public free school fund of this State, the total
sum due upon such acreage, and upon such showing
and payment the Commissioner of the General Land
Office shall issue a patent thereupon when furnished
proper field notes by the County Surveyor of Nueces
County, Texas.

"Sec. 11. The right is hereby expressly re-
served by the State of Texas and the United States
Government to erect on the lands herein conveyed
such wharves, piers and buildings for State or
Government purposes as many hereafter be authorized
by law.

-239-

"Sec. 12.  The fact that the great portion
of the business part of the City of Corpus Christi
and all of the shipping district is located on the
edge of Corpus Christi Bay only a few feet above
sea level and the fact that the waves are daily
eroding the shore line of said Bay and destroying
valuable properties, and the fact that a great
number of Texas people and a great number of
people living at Corpus Christi and a great num-
ber of visitors from the State of Texas and other
States are living in small houses on the Bay front
and located in such manner as to be wholly unpro-
tected from the gulf storms and the fact that a
great number of said houses and nearly all the
boats in the shipping district of Corpus Christi
were destroyed by the storm of August 18th, 1916,
create an emergency and an imperative public neces-
sity that the constitutional rule requiring bills
to be read on three several days be suspended, and
that this Act take effect and be in force from and
after its passage, and it is so enacted."

The Glasscock Fill Area comprises approximately 22.47
acres of land, more or less, located on the bayfront at Corpus
Christi, Texas.  Examination of the property on the ground shows
that most of it is filled in along the bayfront except for a
small strip of upland along Ocean and Shoreline Drives, being
the crest and toe of the Bluff on the westerly side of this
tract of land.  Except for said strip of upland, the fill area,
or land in question, appears to be within the land granted by
the State of Texas to the City of Corpus Christi in the above
statute.  It appears that substantial improvements have been
made to this land in the way of fill work and a concrete retain-
ing wall.

The State of Texas issued a patent on the 4th day of
January, 1924, granting to the City of Corpus Christi 705.78
acres of land described therein embracing a portion of the
waters of Corpus Christi Bay east of its shore line, and between
the northern and southern boundary lines of the City of Corpus
Christi, "bought and fully paid for on the application of City
of Corpus Christi, filed in the General Land Office November 3,
1923, under Act of March 17, 1919," and providing "all mines
and minerals, and mineral rights including oil and gas in and
under said land, together with the right to enter thereon for
the purpose of development, are expressly reserved to the State
of Texas."

The application for patent filed in the General Land
Office November 3, 1923, states:

". . . After the passage of the Act of 1919,
and in the year 1920, the City of Corpus Christi
began the construction of a rip rap breakwater
in the waters of Corpus Christi Bay as contem-
plated by both Acts of the Legislature and for
which the funds were provided by the Act of 1917,
and has completed said breakwater as contemplated,
having constructed 3900 feet of rip rap breakwater
at a cost in all to the City of something more than
$630,000.00. The seawall or breakwater contemplated
by the Act of 1917 and the Act of 1919 has been
completed. . . ."

A copy of a report dated January 4, 1963, by C. M.
Reynolds, Public Works Coordinator, City of Corpus Christi,
Texas, states:

". . . Findings indicate with reasonable
certainty that the construction, referred to in
the patent to the City, was actually completed
and accepted, with final payment to the contrac-
tor approved, on 5 August 1921. Work completed
consisted of the first stage of the Breakwater,
being a portion of the Central Arc, as it now
exists. A review of the plans in our files indi-
cates the 3900 lineal feet to be approximately
correct. . . ."

The City of Corpus Christi, Texas, by special warranty
deed dated March 15, 1937, executed by H. R. Giles, Mayor, con-
veyed to C. M. Gordon et ux, certain property in Corpus Christi
Bay, being part of the land granted to the City of Corpus Christi,
Texas, by H.B. 6, Chapter 68, approved March 17, 1919 (above).
The deed provided that:

". . . Grantees shall, at his own cost
and expense, raise and fill the area herein con-
veyed to city grade level and shall conform to
the Bay Front Improvement Plan of the City of
Corpus Christi, when adopted, in the use and
improvement of the property conveyed to them in
this deed."

The deed further provided that:

". . . Grantees and grantor shall cooperate
in securing a decree of the court or a legislative
act, or both, which will quiet the title to the
property herein conveyed as against claims of the
general public, if any, to said property. . . ."

The City Council of the City of Corpus Christi passed
and approved on the 7th day of April, 1937, a resolution author-
izing and directing the execution of a deed to this property
to C. M. Gordon et ux. The pertinent parts of this resolution
are as follows:

"A resolution authorizing and directing
the mayor of City of Corpus Christi
on behalf of the City to execute a
deed from the City of Corpus Christi
to C. M. Gordon and wife for the ex-
change of certain property rights in
connection with a tract of land situ-
ated within the city limits and
bordering on Corpus Christi Bay and
declaring an emergency.

"BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF
CORPUS CHRISTI:

"Section 1: That the Mayor of the said city
of Corpus Christi, the Honorable H. R. Giles, be,
and he is hereby authorized and directed to exe-
cute a deed conveying the tract of land herein-
after first described, to C. M. Gordon and wife,
Mrs. C. M. Gordon, of San Antonio, Bexar County,
Texas, in exchange for the property rights as
hereinafter secondly described, which said deed
shall be in substance in the same form as deeds
heretofore executed by the City of Corpus Christi,
to riparian property owners, for the exchange of
like property interests along the bay shore of
Corpus Christi Bay, adjacent to the City of Corpus
Christi, Texas, the land to be conveyed by the
City being situated in Nueces County, Texas and
described as follows, to wit:

"* * *

"Section 2: The fact that the Bluff along
Ocean Drive in the city limits of the City of
Corpus Christi has been eroding and is subject to

continued erosion, endangering the safety and
protection of Ocean Drive, along the west
boundary line of the lands herein referred to,
and that the exchange of such property rights
would encourage and enable the protection of
such property and Ocean Drive, and that the
protection of the properties involved creates
a public emergency and a public imperative
necessity requiring the suspension of the
Charter rule providing that no Resolution or
Ordinance shall be passed finally on the date
it is introduced, and that such Ordinance or
Resolution shall be read at three meetings of
the City Council, and that the Mayor having
declared that such public emergency and impera-
tive necessity exists, and requests that said
Charter rule be suspended, and that this Resolu-
tion take effect and be in full force and effect
from and after its passage, and it is accordingly
so ordained. . . ."

The land in question by mesne conveyances was deeded
to C. G. Glasscock, and then to Scotch Investment Company, a
private Texas corporation, and is known as the Glasscock Fill
Area.

In 1941, the Legislature enacted House Bill No. 165,
Chapter 40, filed without the Governor's signature March 14,
1941, effective March 17, 1941, which is set forth as follows:

"CORPUS CHRISTI--TITLE GRANTED TO
CERTAIN SUBMERGED LANDS

"H.B. No. 165          CHAPTER 40.

"An Act granting to the City of Corpus Christi,
Texas, all right, title and interest of the
State of Texas to certain land hitherto sub-
merged by the waters of Corpus Christi Bay;
ratifying and confirming exchanges and con-
veyances of property within the area to cer-
tain private owners; reserving the minerals
unto the State; declaring that the Act shall
be cumulative of former grants and authorities;
and declaring an emergency.

"Be it enacted by the Legislature of the State of
Texas:

"Section 1.  All right, title and interest
of the State of Texas in and to all land within
the area hereinafter mentioned, hitherto or now
lying and situated under the waters of Corpus
Christi Bay, is hereby relinquished, confirmed,
and granted unto the said City of Corpus Christi,
its successors and assigns, for public purposes,
to-wit:

"Beginning at the northeasterly corner of
the city limits of the City of Corpus Christi;
thence southerly along said east boundary line of
said city to its southeasterly corner; thence
westerly along the south boundary line of said
city to its intersection with Ocean Drive; thence
northerly along Ocean Drive, Bay View Avenue,
South Water Street, Water Street and the projec-
tion or extension thereof to the north boundary
line of said city limits; thence easterly along
said city limits to the point of beginning.

"Sec. 2.  All exchanges of property and con-
veyances hitherto made by the City of Corpus
Christi to property owners within the area de-
scribed in Section 1 are hereby ratified; and
such property is confirmed, relinquished, and
granted unto the respective assignees of the
City of Corpus Christi, and to their heirs,
successors and assigns, without limitation as
to use thereof to be made by them.

"Sec. 3.  All mines and minerals, and the
mineral rights including oil and gas in and under
said land, together with the right to enter there-
on for the purpose of developing, are hereby ex-
pressly reserved to the State.

"Sec. 4.  This Act shall be and is cumulative
of all former grants and authority from the State
of Texas to the City of Corpus Christi.

"Sec. 5.  The fact that Chapter 68, Acts of
Thirty-sixth Legislature, 1919, granted to the
City of Corpus Christi all title of the State to
to the submerged lands within the area described

in this Act but the field notes of the patent
issued pursuant thereto omitted certain submerged
tracts that had theretofore been filled; that
the City of Corpus Christi has found it neces-
sary to exchange certain property and convey to
the owners of adjacent private property a portion
of the filled land within such area, in efforts
to quiet City's title, and such private property
owners desire to be quieted in their title,
possession and use of such property so conveyed;
and that it is necessary to the completion of
the City's bay front improvement and storm pro-
tection project that its title be quieted, create
an emergency and an imperative necessity that the
Constitutional Rule requiring bills to be read on
three several days be suspended, and said Rule is
so suspended, and this Act shall take effect and
be in force from and after its passage, and it
is so enacted." (Emphasis added.)

It is noted that the caption of House Bill No. 165,
Chapter 40, effective March 17, 1941, above, refers "to cer-
tain land hitherto submerged by the waters of Corpus Christi
Bay." Your letter states, and investigation reflects, that the
Glasscock Fill Area was not filled in until deeded to C. G.
Glasscock in 1954.

In 1945 the Legislature enacted House Bill No. 492,
Chapter 253, effective May 28, 1945, confirming the original
grant in the 1919 Act above as to "that filled in land lying
landward behind the seawall for public purposes." The pertinent
provisions of this Act are set forth as follows:

"An Act to grant, sell and convey to the City
of Corpus Christi, Texas, all right, title
and interest of the State of Texas to cer-
tain land in said City hitherto submerged
by the waters of Corpus Christi Bay; . . .

"Section 1. All right, title and interest of
the State of Texas in and to all land within the
area hereinafter mentioned, hitherto lying and
situated under the waters of Corpus Christi Bay
for and in consideration of the sum of Ten Thou-
sand Dollars ($10,000) cash, is hereby relin-
quished, confirmed and granted unto the said City
of Corpus Christi, its successors and assigns,
for public purposes, to-wit:

-245-

"Being all of that filled-in land lying and
being situated in Nueces County, Texas, landward
behind the seawall and easterly of the shoreline
of Corpus Christi Bay as shown in Survey No. 803
and in the patent from the State of Texas to the
City of Corpus Christi, Texas, said patent being
dated January 4, 1924, and being Patent No. 86,
Volume 21-A. . . ." (Emphasis added.)

It is noted that House Bill No. 492, Chapter 253,
effective May 28, 1945, referred to "all of that filled-in
land lying and being situated in Nueces County, Texas, land-
ward behind the seawall and easterly of the shoreline of Corpus
Christi Bay." Your letter states, and examination on the ground,
indicates that the Glasscock Fill Area is not situated landward
behind the seawall.

The questions presented in your letter, stated above,
require a true and correct interpretation and construction of
the related statutes herein set forth. Black's Law Dictionary,
3rd Edition, defines "construction" thus:

"The process, or the art, of determining
the sense, real meaning, or proper explanation
of obscure or ambiguous terms or provisions in
a statute, written instrument, or oral agreement,
or the application of such subject to the case
in question, by reasoning in the light derived
from extraneous connected circumstances or laws
or writings bearing upon the same or a connected
matter, or by seeking and applying the probable
aim and purpose of the provision. Quoted with
approval in Koy v. Schneider, 110 Tex. 369, 221
S.W. 880, 884."

Black's Law Dictionary, 3rd Edition, further stated
at page 1000:

"'Construction' is a term of wider scope
than 'interpretation'; for while the latter is
concerned only with ascertaining the sense and
meaning of the subject matter, the former may
also be directed to explaining the legal effects
and consequences of the instrument in question.
Hence interpretation precedes construction but
stops at the written text."

House Bill No. 6, Chapter 68, approved March 17, 1919, set forth above, granting to the City of Corpus Christi certain land lying under the waters of Corpus Christi Bay, including the Glasscock Fill Area, granted the land "to the said city for public purposes only." Section 9 of the Act provided that "this grant to the City of Corpus Christi is upon the express condition, that said city shall within five years from and after the passage of this Act, begin the construction of said seawall and shall within a period of ten years complete same and failure to do so shall forfeit the grant."

In 4 Lange, Texas Practice, Land Titles, Section 340, it is stated that:

"If the language imposes a duty on the grantee to do something, or to refrain from doing something, or that only a certain use shall be made of the property, then it may not be construed as a special limitation and must be construed either as a condition subsequent or as a covenant. Normally, also, there must be language of re-entry if a condition subsequent is created, and language of reversion or revesting of the property in the case of a determinable fee. Further, as concerns conditions, a forfeiture is generally only decreed if the grantee, his heirs, successors or assigns, refuse to comply with such conditions.

". . . a breach of a condition does not operate ipso facto as a forfeiture of the estate; nothing short of an actual entry will serve to defeat an estate upon a condition which has been broken; . . ."

In Section 341, same volume, it is stated that:

". . . a condition subsequent is one which operates upon an estate already created and vested and renders it liable to be defeated, but not as a limitation of the grantee's title. Any doubt as to the type of condition, whether precedent or subsequent, is resolved in the view that such condition is a condition subsequent rather than a condition precedent. The remedy of a grantor upon condition broken is by way of trespass to try title action and not by way of suit to rescind or cancel the deed. . . ."

In City of Dallas v. Etheridge, 152 Tex. 9, 253 S.W.2d 640 (1952), the Supreme Court, Chief Justice Robert W. Calvert, then Associate Justice, held that where condition in conveyance of a tract of land to city provided that city should use the land for park purposes only, that no building or other improvements should be erected upon certain portion of the tract, and that the violation of any of the provisions of the conveyance would at grantor's option terminate the grant, the condition was a condition subsequent, and hence, the construction by city of a street across such restricted portion was a breach of condition which would entitle grantor's successors in interest to exercise the option and to maintain trespass to try title action to recover possession.

In Zachry v. City of San Antonio, 305 S.W.2d 558 (1957), the Supreme Court, Griffin Justice, held that where land had been used as a public park for more than 100 years, and there was never any abandonment of the park, lease of a protion of the park by the city to an individual for 40 years for the construction of an underground parking garage was void. The court said that "all such property (acquired for and actually dedicated to the public use of its inhabitants) is held by the municipality in trust for the use and benefit of its citizens, and is dedicated to the use of the public, and the corporation cannot divest itself of title without special authority from the Legislature. It is only where the public use has been abandoned, or the property has become unsuitable or inadequate for the purpose to which it was dedicated that a power of disposition is recognized in the corporation."

Section 8, Article XI of the Texas Constitution reads as follows:

"Sec. 8.  The counties and cities on the Gulf Coast being subject to calamitous overflows, and a very large proportion of the general revenue being derived from those otherwise prosperous localities, the Legislature is especially authorized to aid by donation of such portion of the public domain as may be deemed proper, and in such mode as may be provided by law, the construction of sea walls, or breakwaters, such aid to be proportioned to the extent and value of the works constructed, or to be constructed, in any locality."

In Attorney General's Opinion No. 0-6817 (1945), it was held as follows:

". . . When, as an engineering fact, it is
necessary to replace, raise, and strengthen the
inside bulkheads of the retaining wall in order
to support the outside seawall, it is our opinion
based on the foregoing authorities, that such
construction would constitute 'an essential and
necessary and component part of the seawall pro-
ject' at Port Lavaca, Texas. . . ."

Attorney General's Opinion No. 0-6817 (1945) cites
pertinent authorities as follows:

". . . In the case of the First National
Bank of Port Arthur v. City of Port Arthur et
al, 35 S.W. (2d) 258, the Beaumont Court of Civil
Appeals said:

"'Counsel for appellees, in their brief,
call our attention to a number of general rules
of construction pertaining to constitutional
provisions. One of these rules is that referred
to by our Supreme Court in Walker v. Meyers, 114
Tex. 225, 266 S.W. 499. The general rule there
referred to is that contemporaneous and practical
construction of constitutional provisions by the
Legislature in the enactment of laws should have
great weight and give rise to a natural presump-
tion that the legislative construction rightly
interprets the meaning of the provision. In
connection with this general rule, counsel for
appellee in their brief direct our attention to
the several acts at different times of the Texas
Legislature granting aid to Gulf Coast cities
under section 8, article 11, of the Constitution.
One of these is the act granting aid to the city
of Galveston shortly after the destructive gulf
hurricane in 1900. Another is the act granting
aid to the city of Corpus Christi; another is the
act granting aid to the city of Freeport; another
is the act granting aid to the city of Rockport;
another is the act granting aid to the city of
Port Lavaca; another is the act granting aid to
the city of Aransas Pass. In this connection
counsel contend, and undertake to sustain the
contention, that the Legislature in each of the
instances above stated gave a broad and liberal

construction to section 8 of article 11 of the Constitution and that the Legislature in those instances did not construe that section to limit state aid to Gulf Coast cities for the construction of sea walls and breakwaters, that is, to those physical structures themselves, but construed section 8 in a broad way so as to give aid to those Gulf Coast cities in the construction of works not actually a part of a sea wall or breakwater. We shall not dwell upon this suggestion of counsel, though we are impressed with the force of this suggestion and the argument in connection. Other general rules of interpretation and construction may be said to be the following:

"'1. The intention of the makers of the Constitution will be ascertained, and when that intention is so ascertained, whether expressed in plain language or not, such intent becomes as much a part of the law as if it had been expressed in plain and unequivocal terms. This was the rule announced by our Supreme Court in Mills County v. Lampasas County, 90 Tex. 606, 40 S.W. 403.

"'2. Legislation, organic or statutory, must be reasonably construed and in a manner not repugnant to common sense. This rule is announced in Queen Insurance Co. v. State, 86 Tex. 250, 24 S.W. 397, 22 L.R.A. 483, and in St. Louis S.W. Railway Co. of Texas v. Tod, 94 Tex. 632, 64 S.W. 778.

"'3. A public grant for a public advantage should be liberally construed in an endeavor to accomplish the purpose of the grant. This rule was announced in Aransas County v. Coleman-Fulton Pasture Co., 108 Tex. 216, 191 S.W. 553.

"'4. In construing a law it will be presumed that the creators of same are familiar with the conditions to be relieved against and the condition of the county to which the act is applicable. Winona & St. P.R. Co. v. Barney, 113 U.S. 625, 5 S.Ct. 606, 28 L.Ed. 1109.

"'5. If possible, that construction will be adopted which will promote the public interests in accord with sound economic policy. This rule was referred to in State v. DeGress, 72 Tex. 242, 11 S.W. 1029.

"'6. In the construction of Constitutions, as well as statutes, the powers necessary to the exercise of power clearly granted will be implied. This rule was referred to in Texas Cent. R. Co. v. Bowman, 97 Tex. 417, 79 S.W. 295.

"'7. Where a general power is conferred, every particular power necessary for the exercise of same is also conferred, whether expressly granted or not. This is the rule laid down in Cooley's Constitutional Limitations (8th Ed.) vol. 1, page 138.

"'In addition to the above general rules of interpretation, we think that the rule announced by our Supreme Court, through Chief Justice Phillips, in Aransas County et al. v. Coleman-Fulton Pasture Company, 108 Tex. 216, 191 S.W. 553, 554, where section 52 of article 3 of our Constitution was under construction, is the rule of greatest application to the facts in this case. It is as follows:

"'"The spirit, purpose and scope of the particular provision are all to be consulted in the effort to determine with certainty the meaning of its terms."

"'Applying that rule in this case, we have no hesitancy in concluding that the expenditure by the city of Port Arthur of its bond money above mentioned for the work done by the Central Construction Company in constructing the Stilwell Storm Drain was not prohibited and would not be in violation of section 8, article 11, of the Constitution. The spirit and the purpose that actuated the framers of that article was mainly the protection of the lives and property of people in cities situated on the Gulf Coast and always exposed to danger and hazard of the sea. Protection to those people and their property, we say,

was the main and controlling thought, and in addition to that, and as incidental to that, was the benefit that would redound and accrue to the people of the whole state of Texas by protecting such of its citizens as live in the exposed cities. It was known that many Texas counties and cities were so situated upon the Gulf Coast as to be constantly exposed to the ravages and destruction of gulf hurricanes, and the purpose of the framers of the article was to give protection, as far as possible through human skill and agency, to the lives and property of our citizens exposed to such hazards.

"'We think that the trial court, under the evidence in this case, was correct in finding and concluding that the construction of the Stilwell Storm Drain, as contemplated, was an essential and necessary and component part of the sea wall project at Port Arthur, and that therefore the Stilwell Storm Drain when completed will be a part of the sea wall in the sense in which that term is used in section 8, article 11, of the Constitution.' . . ."

In the case of City of Aransas Pass et al. v. Keeling, 112 Tex. 339, 247 S.W. 818, the Supreme Court in the opinion by Justice Greenwood stated:

"This suit is brought by the city of Aransas Pass and by the mayor of said city against the Attorney General of the state of Texas, for a mandamus to compel the approval of bonds, issued by the city in the principal sum of $213,000.

"The Thirty-Sixth Legislature, at its third called session, passed an act (Acts 36th Leg. /1920/ 3d Called Sess. c. 22) which became effective on September 17, 1920 entitled:

"'An act to aid the City of Aransas Pass in constructing and maintaining sea walls, breakwaters and shore protections in order to protect said city from calamitous overflows, by donating to it the eight-ninths (8/9) of ad valorem taxes

collected on property and from persons in San
Patricio county for a period of twenty years,
providing a penalty for the misapplication of
the moneys thus donated, and declaring an
emergency.'

"* * *

"The Attorney General urges that the dona-
tion act is unconstitutional and void for the
following reason:

"* * *

"Second. That the act violates section 51
of article 3 of the Constitution, denying power
to the Legislature to make any grant of public
money to a municipal corporation.

"* * *

"The act makes no grant of public money as
forbidden by section 51 of article 3 of the Consti-
tution. The state here bestows no gratuity. The
people of the state at large have a direct and
vital interest in protecting the coast cities from
the perils of violent storms. The destruction of
ports, through which moves the commerce of the
state, is a state-wide calamity. Hence sea walls
and breakwaters on the Gulf coast, though of spe-
cial benefit to particular communities, must be
regarded as promoting the general welfare and
prosperity of the state. It is because of the
special benefits to particular cities and counties
that special burdens on property within their
boundaries, through taxation, are justified. But
the state, in promoting the welfare, advancement,
and prosperity of all her citizens or in aiding
to avert injury to her entire citizenship, cannot
be regarded otherwise than as performing a
proper function of state government. Cities or
counties furnish convenient and appropriate agen-
cies through which the state may perform duties
resting on the state, in the performance of which
the cities or counties have a special interest.

The use of the cities or counties as agents of
the state in the discharge of the state's duty
is in no wise inhibited by the Constitution in
section 51 of article 3.  Bexar County v. Linden,
110 Tex. 344 to 348, 220 S.W. 761; City of
Galveston v. Posnainsky, 62 Tex. 127, 50 Am.
Rep. 517; Weaver v. Scurry County (Tex.Civ.App.)
28 S.W. 836.

"We have concluded that section 8 of article
11 of our Constitution expressly authorized the
Legislature to grant such aid to the counties and
cities on the Gulf coast in the construction of
sea walls and breakwaters, as was extended to
Aransas Pass.  This section reads:"

Section 8, Article XI quoted above.

"* * *

"While these words admit of the interpreta-
tion that state aid to these works was to be ex-
tended only by donation of the public domain in
a mode to be determined by the Legislature, yet
they are obviously as susceptible of the meaning
that the Legislature was empowered to extend state
aid in any different manner adopted by the Legis-
lature.  Viewed in the light of other related con-
stitutional provisions, we have no doubt that the
latter is the true meaning to be ascribed to the
section.  The express wording of the section
recognizes a state interest and a state obligation
in the protection of coast settlements from calami-
tous overflows.  It must have been known that before
many years the public domain would be exhausted.
It would be unreasonable to assume that the framers
of the Constitution did not intend to make it possible
for the Legislature to discharge an obligation which
would be just as binding after as before the exhaus-
tion of the public domain.  The provision for state
aid immediately follows provision for the construc-
tion by coast cities and counties of sea walls and
breakwaters through taxation and bond issues.  By
section 10 of Article 8 the Legislature was ex-
pressly empowered to entirely release state and

county taxes 'in case of great public calamity.'
Can sound reasons be given for asserting that it
was intended to authorize the state to extinguish
all obligations in certain subdivisions of the
state for the payment of state and county taxes,
for such period as the Legislature might deem
necessary, because of great public calamity, and
yet not allow relief to the sufferers from such
calamity and benefit to all the people of the
state through the utilization of the same taxes
in building protective works?  Any doubt as to
the intent of the Constitution to authorize the
grant of public money in case of public calamity
is removed by the language of original section 51
of article 3 of the Constitution.  For it expressly
provided that the denial to the Legislature of the
power to make 'any grant, of public money' should
'not be so construed as to prevent the grant of
aid in case of public calamity.'  Keeping in mind
these related provisions of the Constitution, it
seems clear to us that it was the design of sec-
tion 8 of article 11, when it was adopted, to em-
power the Legislature to give the state's aid, by
grant of the public domain or state taxes, or in
any other appropriate manner, to the construction
by coast cities and counties, through bond issues,
of protective sea walls and breakwaters; and that,
in the exercise of this power, the Legislature was
not limited by the terms of section 6 of article
8, forbidding the appropriation of public money
for a longer period than two years. . . ."
(Emphasis added.)

In 1930 the Legislature passed House Bill No. 90,
Chapter 42, "CONFERRING AUTHORITY ON CITY OF CORPUS CHRISTI
RELATING TO CHANNEL AND SHIPPING DISTRICT."

Section 1 provided:

"That section 6 of Chapter 68, General Laws
of the 36th Legislature, Regular Session, 1919,
be amended so that said Section shall hereafter
read as follows:

". . .'The city of Corpus Christi is hereby
authorized to adjust by suit or otherwise or adopt
compromise by ordinance, determining, defining and

fixing the boundary line between the area patented
by virtue of said Chapter 68 and the private prop-
erty and the rights and claims of property owners
along the shore line of Corpus Christi Bay and
thereby adjust and quiet the title to said
patented area (for the purposes designated in
said Chapter 68) and adjust and quiet the title
of said private property owners.'"

House Bill No. 165, Chapter 40, supra, passed by the
Legislature in 1941 covered the area where the Glasscock Fill
is located, as shown in the description of the property covered
by the 1941 Act.  It is true that the caption of the 1941 Act
refers to "certain land hitherto submerged by the waters of
Corpus Christi Bay."

Webster's New International Dictionary, 2nd Edition,
Unabridged, defines the word hitherto as, "up to this time; as
yet; until now."  Black's Law Dictionary, 4th Edition, defines
the word hitherto as, "in legal use this term always restricts
the matter in connection with which it is employed to a period
of time already passed.  Mason v. Jones, 13 Barb. (N.Y.) 479."

Section 1 of the 1941 Act refers to "all land within
the area hereinafter mentioned, hitherto or now lying and situ-
ated under the waters of Corpus Christi Bay."

As stated above, the Glasscock Fill Area was not
filled in until 1954.  Accordingly, it is consistent that the
1941 Act included the Glasscock Fill Area even though it was
submerged at the time of the Act.  As shown above, the City of
Corpus Christi, Texas, conveyed the area now known as the
Glasscock Fill Area, to C. M. Gordon et ux by deed dated March
15, 1937.

Section 2 of the 1941 Act, supra, provides:

"All exchanges of property and conveyances
hitherto made by the city of Corpus Christi to
property owners within the area described in Sec-
tion 1 are hereby ratified; and such property is
confirmed, relinquished, and granted unto the
respective assignees of the City of Corpus Christi,
and to their heirs, successors and assigns, with-
out limitation as to use thereof to be made by
them."

Honorable Grainger McIlhany, page 21 (C-52)

It is therefore apparent that this section of the 1941 Act is applicable to the Glasscock Fill Area conveyed by the City of Corpus Christi to C. M. Gordon et ux on March 15, 1937.

As shown above, Section 2 of the resolution by the City Council of the City of Corpus Christi, approved April 7, 1937, authorizing this conveyance to C. M. Gordon et ux, provided:

"The fact that the Bluff along Ocean Drive in the city limits of the City of Corpus Christi has been eroding and is subject to continued erosion endangering the safety and protection of Ocean Drive, along the west boundary line of the lands herein referred to, and that the exchange of such property rights would encourage and enable the protection of such property and Ocean Drive, and that the protection of the properties involved creates a public emergency and a public imperative necessity . . ." (Emphasis added.)

As above stated, the deed by the City of Corpus Christi, Texas, to C. M. Gordon et ux, provides:

". . . Grantees shall, at his own cost and expense, raise and fill the area herein conveyed to city grade level and shall conform to the Bay Front Improvement Plan of the City of Corpus Christi, when adopted, in the use and improvement of the property conveyed to them in this deed." (Emphasis added.)

In the First National Bank of Port Arthur v. City of Port Arthur, et al case, supra, the opinion states:

". . . Counsel for appellant and the Attorney General in this connection direct our attention to the definition of the term 'sea wall,' as given by the New Century Dictionary, volume 4, page 411. As there defined, a sea wall is:

"'A cliff by the sea, a wall formed by the sea; a strong wall or embankment on the shore designed to prevent encroachment of the sea to form a breakwater. An embankment of stone thrown up by the waves on a shore.'"

It is clear, therefore, that the exchange and the conveyance by the City of Corpus Christi to C. M. Gordon ex ux of the area now known as the Glasscock Fill Area, as part of the exchange, was for public purposes in connection with the Bay Front Improvement Plan of the City of Corpus Christi, and was in exchange for land needed by the City of Corpus Christi for its Bay Front Improvement Plan, as contemplated by the statutes, and therefore was for a public purpose.

In view of the above authorities and reasons stated, it is therefore clear that this conveyance by the City of Corpus Christi to C. M. Gordon et ux of the area comprising the Glasscock Fill was for a public purpose and therefore is not in violation of Article 3, Section 51 of the Constitution of Texas, which provides:

"Sec. 51. The Legislature shall have no power to make any grant or authorize the making of any grant of public moneys to any individual, association of individuals, municipal or other corporations whatsoever; . . ."

and is not in violation of Article 3, Section 44 of the Constitution of Texas, which provides:

"The Legislature shall . . . nor grant, by appropriation or otherwise, any amount of money out of the Treasury of the State, to any individual, on a claim, real or pretended, when the same shall not have been provided for by pre-existing law; . . ."

and is not contrary to the holding of the court in State v. Perlstein, et al, 79 S.W.2d 143 (Civ.App. 1935, error dism.), which held under the facts in that case a conveyance of State land to a private individual void ". . . because the officers executing it had no authority in law to do so. . . ."

Therefore, in view of the above authorities, when this land was originally granted to the City of Corpus Christi under the 1919 Statute, supra, the grant was made with the condition subsequent that the seawall be completed as provided in the statute. It appears that the seawall or breakwater has been completed as contemplated by the statute and thereafter a patent was issued by the State of Texas to the

City, providing that the land was bought and fully paid for on the application of City of Corpus Christi. Even in the event of a condition broken, the remedy of a grantor is by way of trespass to try title action to recover possession and not by ipso facto reverter. The exchange was for public purposes and in furtherance of the State's interest and the State's obligation to protect coast settlements from calamitous overflows, in connection with the Corpus Christi Bay Front Improvement Plan, and the conveyance was for land needed by the City as contemplated and authorized by Section 8 of Article XI, and as authorized and confirmed by the statutes. The 1930 Act authorized the exchange for such public purposes and the 1941 Act validated it, and the Legislature stated in the Act that the exchange was "necessary to the completion of the City's bay front improvement and storm protection project." This exchange of properties as authorized and later ratified by the Legislature was clearly for the purpose for which the original grant was made.

Therefore, your first question is answered that the Glasscock Fill Area has not reverted to the State. Your second question is answered that the Glasscock Fill Area has been lawfully conveyed by the City of Corpus Christi, as it was for exchange of land needed to further the State's interest and the State's obligation to protect coast settlements from calamitous overflows, and such exchange was for a State public purpose. Your third question is answered that the State of Texas presently owns all mines and minerals, and mineral rights including oil and gas in and under the Glasscock Fill Area, together with the right to enter thereon for the purposes of development.

## SUMMARY

1. The Glasscock Fill Area has not reverted to the State.

2. The Glasscock Fill Area has been lawfully conveyed by the City of Corpus Christi, as it was for exchange of land needed to further the State's interest and the State's obligation to protect coast settlements from calamitous overflows, and such exchange was for a State public purpose.

3. The State of Texas presently owns all mines and minerals, and mineral rights including oil and gas in and under the Glasscock Fill Area, together with the right to enter thereon for the purposes of development.

Yours very truly,

WAGGONER CARR
Attorney General of Texas

By Ben M. Harrison
Ben M. Harrison
Assistant

BMH:afg

APPROVED:

OPINION COMMITTEE
W. V. Geppert, Chairman

H. Grady Chandler
J. S. Bracewell
Edward Moffett

APPROVED FOR THE ATTORNEY GENERAL
BY: Stanton Stone